## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:20cr62 |
| | ) | |
| FRANCISCO EDGARDO PALACIOS | ) | |
| ARIAS, | ) | |
| Defendant | ) | |

### MOTION TO DISMISS INDICTMENT

Francisco Edgardo Palacios Arias, through counsel, moves the Court to dismiss the indictment against him in this case because his prior removal from the United States was constitutionally defective and cannot serve as a predicate for prosecution under 8 U.S.C. § 1326. The lawyer that represented him at his immigration hearing provided him ineffective assistance of counsel in several ways, detailed below. But for Mr. Palacios's attorney's ineffectiveness, there is a reasonable probability that the immigration judge would have granted him relief. He is excused from any additional exhaustion of administrative remedies and was deprived of judicial review. Thus, the removal order is invalid and cannot be used as evidence in this case.

As also detailed further below, historical records make clear that Congress was motivated by a discriminatory purpose in creating the crime of illegal reentry. Under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and its progeny, then, the crime of illegal reentry in 8 U.S.C. § 1326 violates the equal protection of the laws under the Fifth Amendment's guarantee of due process. The Court must find that the immigration judge's removal order was invalid and must dismiss the indictment in this case.

I.      **Facts**

Francisco Palacios Arias was born in 1996 in El Salvador.  El Salvador was still reeling from a long and devastating civil war.  The Secretary General of the United Nations forwarded to the U.N. Security Council in 1993 a report on the severe damages that the Salvadoran civil war had caused, which began:

> Violence was a fire which swept over the fields of El Salvador; it burst into villages, cut off roads and destroyed highways and bridges, energy sources and transmission lines; it reached the cities and entered families, sacred areas and educational centres; it struck at justice and filled the public administration with victims; and it singled out as an enemy anyone who was not on the list of friends. Violence turned everything to death and destruction, for such is the senselessness of that breach of the calm plenitude which accompanies the rule of law, the essential nature of violence being suddenly or gradually to alter the certainty which the law nurtures in human beings when this change does not take place through the normal mechanisms of the rule of law. The victims were Salvadorians and foreigners of all backgrounds and all social and economic classes, for in its blind cruelty violence leaves everyone equally defenceless.

The Commission on the Truth for El Salvador, *From Madness to Hope: the 12-Year War in El Salvador: Report of the Commission on the Truth for El Salvador*, U.N. Security Council (April 1, 1993), *available at* https://www.usip.org/sites/default/files/file/ElSalvador-Report.pdf (last visited August 12, 2020).  During the war, tens of thousands of Salvadorans were murdered, massacred, and abducted.

In 1996, the United States began to aggressively deport immigrants convicted of crimes back to their home countries.  *See* United Nations Office on Drugs and Crime, *Crime and Development in Central America: Caught in the Crossfire* at 16 (May 2007), https://www.unodc.org/documents/data-and-analysis/Central-america-study-en.pdf.      Mara Salvatrucha ("MS13"), the Salvadoran street gang that formed on the streets of Los Angeles, California in the 1980s and spread to El Salvador itself once its members were deported, flourished.  *Id.* at 58-59.  El Salvador has historically had one of the highest murder rates in the

world.  *Id.* at 53.  Kidnapping and extortion have also become increasingly common in all parts of El Salvador.  *Id.* at 69.

In September 2001, when Mr. Palacios was just about five years old, his uncle, Miguel Angel Arias Granados, and another individual, were kidnapped in El Salvador and tortured for eight days.  *See* Ex. L.[1]  The kidnappers posed as national police officers and extorted Mr. Arias's family for 105,000 Colóns.[2]  *Id.* at 1, 7, 12, 16.  Mr. Arias was sixty-one years old at the time he was kidnaped.  He had two sons who had been living and working in the United States.  Before Mr. Arias was kidnaped, men had come around his home asking where Mr. Arias's sons were. The family was not one of means, but the kidnapers seemed to believe that they did because of the family's connection to the United States.  The family went to the police because they feared for Mr. Arias's life.  Ultimately, the police found Mr. Arias and the government prosecuted his captors. *See* Ex. L.  Mr. Arias, now an elderly gentleman, has become a legal permanent resident in the United States.

Mr. Palacios's mother had come to the United States before February 13, 2001.[3]  When she left El Salvador, she left Mr. Palacios in her sister's care.  He lived with his aunt very close to Mr. Arias.  *See* Ex. M at 13.  After Mr. Arias's kidnaping, the family kept Mr. Palacios hidden in the house.  They feared that he too would be kidnaped because his mother lived in the United States.

---

[1] Mr. Palacios requests an evidentiary hearing on this motion.  At that hearing, he will present additional evidence regarding the facts presented in this motion relating to his family and his immigration proceedings.

[2] Since January 2001, the dollar has a fixed conversion rate in El Salvador of one dollar to every 8.75 Colóns.     *See*     James   Chen,     *SVC   (El   Salvador   Colon)*     (Feb.   17,   2018), https://www.investopedia.com/terms/forex/s/svc-el-salvador-colon.asp.     In  September  2001,  105,000 Colóns was worth $12,000 U.S. dollars.

[3] El Salvador suffered two powerful earthquakes that killed many hundreds of Salvadorans, demolished and damaged hundreds of thousands of homes and properties, and shrunk El Salvador's GDP significantly in January and February 2001.  *See* CNNfyi.com, *Another deadly quake strikes El Salvador* (Feb. 13, 2001), http://www.cnn.com/2001/fyi/news/02/13/salvador.quake/index.html.  After that, many Salvadorans fled to the United States for refuge and ultimately were granted Temporary Protected Status.

Men the family believed to be associated with Salvadoran gangs, or "maras," painted what appeared to be gang symbols on the walls of the family's property. These men would hover outside of the family's property and even left a note asking, "Where is Francisco?"

In 2003, the family was able to save up enough money to bring Mr. Palacios to the United States. He was seven years old. He did nearly all of his schooling in the United States. He went to Meadow Brook High School and worked in construction jobs. *See* Ex. N at 81.[4] He speaks fluent English. And in 2017, after serving a sentence for some misdemeanor offenses in Virginia, he was arrested by immigration authorities and brought into removal proceedings. His family hired a local immigration law firm to represent Mr. Palacios in his removal proceedings. An associate attorney for the firm, Juan Carlos Ruiz, handled the case. Mr. Ruiz is no longer with that firm and to undersigned counsel's knowledge, is not working as a lawyer anywhere currently. The law firm filed a detailed application for asylum, withholding of removal, and relief under the Convention Against Torture. *See* Ex. M.

In August 2017, while Mr. Palacios was in removal proceedings and before he submitted his application for relief, Mr. Palacios's aunt—also with a last name of Arias—was brutally murdered in El Salvador. *See* Ex. M at 209. Her father was injured in the attack and was hospitalized. The attackers were never caught. Mr. Palacios included this information in his written application for relief. *Id.* His uncle in El Salvador, Julio Arias Moreno, also submitted a written declaration about Mr. Palacios's aunt's murder. *Id.* at 163. Before the removal hearing on September 14, 2017, Mr. Ruiz spoke with Mr. Palacios's family members about the hearing. Mr. Ruiz told Mr. Palacios's mother to come to the hearing in Arlington, Virginia on September 14, 2017. He also told her to bring Mr. Arias with her so that he could testify about the events that

---

[4] For ease of reference, all pages numbers referenced in Exhibits M, N, O, and P follow the Bates stamp pagination at the bottom right-hand corner of the page.

happened to him that led the family to bring Mr. Palacios to the United States for his own safety. Mr. Ruiz told Mr. Palacios's mother that it would be best to have Mr. Arias testify directly about his experiences and how those impacted Mr. Palacios.

As directed, Mr. Palacios's mother came to the hearing. She came with Mr. Arias, Mr. Palacios's sister, and two other family members. Mr. Palacios's mother and Mr. Arias are native Spanish speakers and needed a Spanish interpreter. Mr. Ruiz knew that. When Mr. Palacios's family got to the immigration court building in Arlington, they located the correct room the hearing would be held in. They notified Mr. Ruiz that they were there. They asked Mr. Ruiz if they could come in to the hearing. Mr. Ruiz told them to stay outside of the courtroom and that he would come back to get them. He never came back to get them.

Inside the courtroom, Mr. Ruiz was stumbling. Mr. Ruiz had previously indicated to the immigration judge that Mr. Palacios needed a Spanish interpreter. *See* Ex. N at 70. So, on September 14, 2017, the immigration court had a Spanish staff interpreter present and ready to go. *Id.* at 73. Mr. Palacios speaks fluent English and did not need an interpreter. *See* Ex. N at 74-75. Toward the beginning of the hearing, the government pointed out to the court that one of the exhibits in Mr. Palacios's application for relief was in Spanish. *See* Ex. M at 170-203. That document was the criminal prosecution summary, which contained critical details of Mr. Arias's kidnaping. *Compare* Ex. M at 170-203 (Spanish version) *and* Ex. L (English version). Mr. Ruiz told the immigration judge, "We know you wouldn't consider it without translation, but unfortunately, [the] family wasn't able to come up with the translation for this court date. We're fine proceeding without that, your honor." Ex. N at 77. Mr. Ruiz had never asked the family to have the prosecution summary translated into English or asked them for any additional money so

that he could arrange to do so.  The family would have done either of those things if they knew it needed to be done.

Then, despite having a Spanish interpreter available in the courtroom who could have sight translated critical pieces of the prosecution summary for the immigration judge during the hearing and despite having Spanish speaking witnesses in the hallway outside the courtroom who needed an interpreter, Mr. Ruiz agreed to dismiss the staff interpreter.  *See* Ex. N at 75.  The only witness that Mr. Ruiz called at the hearing was Mr. Palacios.  Mr. Palacios did his best to advocate for himself, but he did not know the details about Mr. Arias's kidnaping or all of the lengths the family had taken to protect Mr. Palacios from being kidnaped himself for being a part of the Arias family. *See* Ex. N at 80-103.  Mr. Ruiz never called the witnesses sitting in the hallway outside of the courtroom ready and willing to provide those details to the judge.

Before the beginning of the September 14, 2017, hearing, Mr. Ruiz had also agreed with the government attorney to relinquish Mr. Palacios's asylum claim on the grounds that Mr. Palacios could not establish that he had "changed circumstances" that materially affected his eligibility for asylum.  *See* Ex. N at 79, 114.  As further explained below, Mr. Palacios's aunt's murder just over a month before the hearing and her father's victimization justified accepting the late asylum application.  Additionally, Mr. Ruiz, in arguing for withholding of removal (which involves legal arguments similar to asylum), identified the particular social group that Mr. Arias was a part of as "a Salvadorian adult male, who was raised and lived in the U.S. since middle childhood," *see* Ex. N at 114, rather than as a member of his own family.  The immigration judge, having no other testimony before her that would have clarified the threat of persecution that Mr. Palacios faced because of his family membership, denied the application for relief and ordered Mr. Palacios removed.  *See* Ex. O.

While the law firm that Mr. Palacios's family hired made clear that his family was a proffered social group on appeal to the Board of Immigration Appeals ("BIA"), *see* Ex. P at 33-35, Mr. Ruiz never made that argument to the immigration judge and did not present the evidence he had to substantiate that assertion to the immigration judge. *See* Ex. N at 114-16. The BIA did not consider that argument on appeal as it was not presented to the immigration judge. *See* Ex. Q. While technically, Mr. Palacios could have appealed the BIA's denial to the Fourth Circuit Court of Appeals, because Mr. Ruiz had not presented the readily available evidence needed to substantiate his claims for relief, further appeal was futile.

Mr. Palacios was deported in March 2018 and remained in El Salvador until sometime before an anonymous tipster told the immigration hotline that Mr. Palacios was in the United States and where he lived. Immigration officers obtained an arrest warrant from this Court for Mr. Palacios on suspicion that he had committed the crime of illegal reentry. He was arrested on that warrant, held on a criminal complaint, and later indicted in this Court. He now moves to dismiss the indictment in this case. Further facts are noted below as needed.

II.   **Argument**

a.   ***The removal order in this case was based on due process violations.***

The Supreme Court recognized in *United States v. Mendoza-Lopez*, 481 U.S. 828, 838-39 (1987), that a person charged with a violation of 8 U.S.C. § 1326 has a due process right to judicial review of the deportation "in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense." After *Mendoza-Lopez*, Congress added subsection (d) to § 1326, which provides a statutory right to challenge the validity of a prior removal order in § 1326 cases. Under 8 U.S.C. § 1326(d), to challenge the validity of a prior order of removal, a defendant must show 1) exhaustion of administrative remedies (or excusal from the

exhaustion requirement); 2) deprivation of the opportunity for judicial review (or excusal); and 3) that the entry of the order was fundamentally unfair. An order is "fundamentally unfair" where there was a) a due process violation and b) prejudice. Prejudice, in turn, requires a showing that there is a "reasonable probability" that the outcome of the proceedings would have been different. *See United States v. El Shami*, 434 F.3d 659, 664-65 (4th Cir. 2005).

> i. *The immigration hearing was "fundamentally unfair" because of Mr. Ruiz's ineffective assistance of counsel.*

Deficient performance of counsel can result in a due process violation in removal proceedings. *See United States v. Lopez-Chavez*, 757 F.3d 1033 (9th Cir. 2014). The Fifth Amendment guarantees aliens the right to competent representation by counsel in deportation hearings. *See Iturribarria v. INS*, 321 F.3d 889, 899-900 (9th Cir. 2003). Ineffective assistance of counsel exists "'if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" *Rodriguez-Lariz v. INS*, 282 F.3d 1218, 1226 (9th Cir. 2002) (quoting *Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir. 1985)); *see also Figeroa v. INS*, 886 F.2d 76 (4th Cir. 1989) (finding that attorney negligence or incompetence was the only plausible explanation for attorney's failure to file asylum application, but ultimately holding that no prejudice existed because Mr. Figeroa would not have qualified for asylum if his attorney had filed the application). To make a colorable showing of ineffective assistance of counsel, an alien must show that counsel's deficient performance resulted in prejudice such that there is a "reasonable probability" that the outcome of the proceedings would have been different. *See United States v. El Shami*, 434 F.3d 659, 664-65 (4th Cir. 2005).

Here, Mr. Ruiz's deficient performance is apparent from four aspects of the deportation hearing: (1) his failure to articulate the persecuted social group, Mr. Palacios's family, that Mr. Palacios was a part of; (2) his failure to call witnesses present and able to testify to substantiate

Mr. Palacios's claim that he was a member of a particular social group that suffered persecution; (3) his failure to present a Spanish translation of a necessary exhibit; and (4) his inaccurate concession that Mr. Palacios could not demonstrate "changed circumstances," justifying a late asylum application. But for these failures, there is a reasonable probability that Mr. Palacios would have gotten relief from deportation. Because the due process violations here are coterminous with prejudice, Mr. Palacios presents them simultaneously here.

First, the immigration judge and the BIA denied Mr. Palacios's claim for withholding of removal, finding that Mr. Palacios had not articulated his membership in a social group subject to persecution. In *Crespin-Valladares v. Holder*, 632 F.3d 117, 124-25 (4th Cir. 2011), the Fourth Circuit joined the three other circuits that had then considered and found that "kinship ties" were a sufficient social group for asylum. "'[K]inship ties' [are] paradigmatically immutable, and the BIA has since affirmed that family bonds are innate and unchangeable." *Id.* at 124 (internal citations omitted); *see also Salgado-Sosa v. Sessions*, 882 F.3d 451, 453 (4th Cir. 2018) ("The record compels the conclusion that at least one central reason for Salgado–Sosa's persecution is membership in his family, a protected social group under the Immigration and Nationality Act."). Had Mr. Ruiz used Mr. Palacios's family membership as the relevant social group, there is a greater than reasonable probability that the immigration judge would have found that element of asylum and withholding of removal[5] satisfied.

---

[5] A person is eligible for asylum if they have 1) a well-founded fear, 2) of persecution, 3) perpetrated by the government or an entity the government cannot or will not control, 4) on account of, 5) one of five protected grounds (including social group). *See* 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158. Once a person is deemed eligible for asylum, the immigration judge has some discretion in deciding whether to grant that relief. Withholding of removal is very similar to asylum, except that there must be a "clear probability" of persecution rather than a "well-founded fear" of persecution, as required for asylum eligibility. *See* 8 U.S.C. § 1231(b)(3)(A); *INS v. Stevic*, 467 U.S. 407 (1984).

Second, Mr. Ruiz failed to present critical evidence to support a finding that Mr. Palacios feared returning to El Salvador because of his family's persecution there by gang members. Mr. Ruiz did not ask the family to have the criminal prosecution summary from his uncle's kidnaping translated for the immigration court to consider. He did not call Mr. Arias and Mr. Palacios's mother, who were present outside the courtroom and ready to testify as witnesses to provide more detail about how Mr. Arias's kidnaping gave rise to Mr. Palacios's credible fear of persecution by Salvadoran gangs who were attacking and extorting the Arias family. These failures clearly constitute ineffective assistance of counsel and were critical to the immigration judge's denial of relief. Had Mr. Ruiz presented this evidence, there is a reasonable probability that the immigration judge would have found that Mr. Palacios was a member of a persecuted social group and granted relief.

Third, Mr. Ruiz improperly conceded that Mr. Palacios was time-barred from applying for asylum. While Mr. Palacios's asylum application was more than a year after he had entered the United States, a person may apply for asylum after that timeframe if they can show, as is relevant here, "the existence of changed circumstances which materially affect the applicant's eligibility for asylum . . . .' 8 U.S.C. § 1158(a)(2)(D). The Fourth Circuit has joined the Second, Sixth, and Ninth Circuits in finding that "[n]ew facts that provide additional support for a pre-existing asylum claim can constitute a changed circumstance. These facts may include circumstances that show an intensification of a preexisting threat of persecution or new instances of persecution of the same kind suffered in the past." *Zambrano v. Sessions*, 878 F.3d 84, 88 (4th Cir. 2017).

Mr. Palacios's aunt's very recent murder and her father's attack present just such an intensification of the preexisting threat of persecution. Mr. Palacios's aunt was brutally murdered in her home by unknown gang members. She was a member of the Arias family that continued to

have relatives in the United States.  By 2017, gang violence and extortion were even further beyond the Salvadoran government's control than they had been in 2017.  *See, e.g.*, Ahmed Azam, *They Will Have to Answer to Us*, N.Y. Times Mag., Nov. 29, 2017, https://www.nytimes.com/2017/11/29/magazine/el-salvador-police-battle-gangs.html (describing the more recent atrocities of gang violence in El Salvador, and reporting gang announcement that, "We want to make the government aware that it cannot put an end to the gangs").  The violence against Mr. Arias's family had intensified during his time in the United States, not lessened.  And while Mr. Palacios was in the United States, gang members continued to hover around his family's property, wanting to know, where was the young man of the family, Francisco Palacios Arias?  These incidents demonstrate a reasonable probability that had Mr. Ruiz argued that circumstances had changed for Mr. Palacios, justifying a late asylum application, the immigration judge would have deemed the application for asylum timely.  *See, e.g.*, *Zambrano*, 878 F.3d at 85, 88 (remanding to BIA for evaluation of changed circumstances in case where gang had continued searching for alien and had broken into family's home in Honduras).

An attorney's ineffective assistance of counsel that impacts an immigrant's ability to put forth his case for relief constitutes prejudice.  *See, e.g., Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) ("According to respondent, counsel's deficient performance deprived him of a notice of appeal and, hence, an appeal altogether. . . . the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice because 'the adversary process itself' has been rendered 'presumptively unreliable.' The even more serious denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right, similarly demands a presumption of prejudice."); *Figeroa v. INS*, 886 F.2d 76 (4th Cir. 1989) (finding that attorney negligence or incompetence was the only plausible explanation for attorney's failure to

file asylum application, but ultimately holding that no prejudice existed because Mr. Figeroa would not have qualified for asylum if his attorney had filed the application).  Here, but for Mr. Ruiz's ineffectiveness in articulating a valid social group, failing to present readily available evidence to substantiate persecution of that social group, and improperly relinquishing Mr. Palacios's asylum claim, there is a reasonable probability that the immigration judge would have granted Mr. Palacios relief.  Thus, Mr. Palacios has shown that the removal order in this case was "fundamentally unfair" under 8 U.S.C. § 1326(d)(3).

### ii. *Waiver of exhaustion and deprivation of judicial review*

An attorney's ineffective assistance of counsel that causes an alien's failure to exhaust administrative remedies excuses the defendant's failure to exhaust administrative remedies and deprived him of judicial review. *See United States v. Cerna*, 603 F.3d 32, 42 (2d Cir. 2010) ("it would be incongruous to hold that an alien may be denied the meaningful opportunity for judicial review because of his counsel's incompetence so that § 1326(d)(2) is satisfied but that his counsel's incompetence cannot excuse his failure to seek or obtain administrative review"); *see also United States v. Lopez-Chavez*, 757 F.3d 1033, 1044 (9th Cir. 2014).

Here, Mr. Ruiz's ineffectiveness made appealing to the BIA pointless because the necessary arguments and evidence were not presented to the immigration judge.  *See* Ex. Q (rejecting arguments made on appeal to BIA that were not presented to immigration judge). Further appeal to this Court without the necessary arguments and evidence would have been futile. Thus, Mr. Palacios has shown that Mr. Ruiz's ineffective assistance of counsel excuses any failure to exhaust any additional administrative remedies and also deprived Mr. Palacios of judicial review.  Thus, this Court must dismiss find the removal order in this case invalid and dismiss the indictment in this case.

**b. Congress enacted the crime of illegal reentry with a clear history of discriminatory intent that violates the right to equal protection of the laws in the Fifth Amendment.**

Enacted at the height of the eugenics movement, 8 U.S.C. § 1326 was originally titled the "Undesirable Aliens Act of 1929." It was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[6] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons." They claimed Mexicans were "poisoning" the American citizen. They sought to keep the country's blood "white and purely Caucasian." They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[7]

Because the facts and historical evidence presented herein show that the original illegal reentry law was enacted with a discriminatory purpose, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Palacios' criminal charge.

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1

---

[6] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001[,] courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).
[7] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration, 1924-1965*, at 3 (2020) (quoting Senator David A. Reed).

(2017).  A law may violate equal protection in three ways.  First, a law may discriminate on its face.  *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967).  Second, authorities may apply a facially neutral law in a discriminatory way.  *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).  Third, a legislature may enact a facially neutral law with a discriminatory purpose.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Palacios challenges § 1326 only under the third rationale, so the legal framework of *Arlington Heights* applies.  Determining whether a motivating purpose for enacting the law was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* at 266.  *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: 1) the impact of the official action and whether it bears more heavily on one race than another; 2) the historical background of the decision; 3) the specific sequence of events leading to the challenged action; 4) the legislature's departures from normal procedures or substantive conclusions; and 5) the relevant legislative or administrative history. 429 U.S. at 266–68.

The threshold for satisfying these factors is low.  Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes."  *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a motivating factor in the decision."  *Id.* at 265–66. Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered."  *Arlington Heights*, 429 U.S. at 270 n.21.  *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (observing if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate

that the law would have been enacted without this factor.").  If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated.  *Id.* at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions.  One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude."  *Hunter*, 471 U.S. at 222.  Though neutral on its face, the provision disenfranchised ten times as many blacks as whites.  *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians.  *See id.* at 229.  This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision.  *Id.* at 229–31.  And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection.  *Id.* at 231; *see also NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (invalidating voter registration restrictions in North Carolina, and observing that "[t]he record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans"); *Arce v. Douglas*, 793 F.3d 968, 978-81 (9th Cir. 2015) (evaluating challenge to Arizona law shutting down a Mexican-American Studies program in the Tucson school district, and finding critical in case that legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples")

These cases show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups. As Mr. Palacios will show, the same animus infected § 1326 to an equal (or even greater) degree.

*i.   Congress enacted illegal reentry with a discriminatory purpose.*

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268.   And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality.  *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020) ("Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898.  According to one committee chairman, the avowed purpose of that convention was to "establish the supremacy of the white race," and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements.").   A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law.  *Arlington Heights*, 429 U.S. at 265. They were the primary factor.

A.  "The historical background of the decision."

Historians often refer to the 1920s as the "Tribal Twenties," a time when the Ku Klux Klan strengthened, Jim Crow laws were enacted, and public figures praised eugenics.  World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics

of restriction."[8]  Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[9] and "the 'contamination' of Anglo-American society."[10]  The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[11]  At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[12]  During the remainder of the decade, legislators aimed for "'America [to] cease to be the 'melting pot.'"[13]  Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[14]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[15]  The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[16]  The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[17]  And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[18]

---

[8] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).
[9] *Id.* at 23.
[10] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).
[11] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).
[12] Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921).
[13] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).
[14] Hernández, *supra*, at 28.
[15] Yang, *supra*, at 35.
[16] *Id.* at 8.
[17] Okrent, *supra*, at 3.
[18] *Id.* at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[19]  Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[20]  During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population."  *See* Ex. A.  Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[21]

B.  "The specific sequence of events leading to the challenged action."

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white.  *See Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent").  The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[22]  The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.  Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaiʻi, Puerto Rico, and

---

[19] Ngai, *supra*, at 24.
[20]    *Harry    Laughlin    and    Eugenics*,    Truman    State    University.    Accessible    at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.
[21] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).
[22] Ngai, *supra*, at 24–25.

Alaska.[23]  Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[24] Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere.  This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[25]  As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons."  *See* Ex. B.

So despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon."[26]  *See* Ex. C. Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel."  *See* Ex. D. Legislators proposed numerous bills restricting Mexican immigration but none could survive opposition from southwestern growers.  To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

### C.  "The relevant legislative or administrative history."

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[27]  Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories—

---

[23] *Id*. at 26.
[24] *Id*. at 35.
[25] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).
[26] Benjamin Gonzalez O'Brien, Benjamin, Chap. 1, *Handcuffs and Chain Link* (2018).
[27] *See* Vought, *supra*, at 174–79.

even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[28]  Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[29]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[30]  So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease,[31] Davis developed a compromise—Congress would criminalize border crossing after the fact, rather than prevent it in the first place.[32]  That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[33]

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization."  *See* Ex. D.  In one speech at an immigration conference, Rep. Box had explained that:

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs.  Into that was fused much negro slave blood . . . .  The prevention of such

---

[28] *Id*.

[29] *Id*. at 174–75.

[30] *Id*. at 216.

[31] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206.

[32] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

[33] *Id.*

mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id.*  Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position."  Ex. B at H3619.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington.  Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[34]  He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[35]  He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed."[36]  Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[37]

Following these legislators' lead, other lawmakers soon "turned to narratives of racial threat to justify restriction."[38]  In February 1928, for instance, Representative Robert A. Green of Florida delivered a speech (read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas.  He asserted that countries south of the U.S. are "composed of mixture blood of White, Indian, and negro."  *See* Ex. E.  Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put

---

[34] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).
[35] *Id.*
[36] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).
[37] Okrent, *supra*, at 3.
[38] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

it at a disadvantage to countries that have "kept their blood white and purely Caucasian." *Id.* at H2462.

Chairman Johnson had convened hearings on new immigration legislation. *See* Ex. F.  At the first hearing, in January 1926, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."  Ex. F at 30.  In response to this letter, Commissioner General of Immigration Harry Hull stated, "I think he is right."  Ex. F at 30.  Rep. Box added, "I have some letters, Mr. Chairman, just like that."  *Id.*  In April 1926, the same House committee held a hearing entitled, "The Eugenical Aspects of Deportation," where the principle witness was the well-known eugenicist Dr. Laughlin.  *See* Ex. A at 1.  Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy."  Ex. A at 3.  Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination."  Ex. A at 3.  When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Ex. A at 11.

Dr. Laughlin discussed the need for further research into "mate selection" because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes."  Ex. A at 19.  The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Ex. A at 19.  By deporting or excluding the "lower races" from the country, Dr. Laughlin

contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Ex. A at 19. In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Ex. A at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Ex. A at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Ex. A at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Ex. A at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Ex. A at 45. When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Ex. A at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Ex. A at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Ex. A at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report

to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully."  Ex. G.  This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law.  Ex. G at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could."  Ex. H.  The full Senate passed the bill with almost no discussion or debate.  *See* Ex. H at S2092.  Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law.  *See* Ex. I.

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years."  Ex. B.  Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there."  Ex. B.  Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back."  Ex. B at H3619.  Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable."  Ex. B at H3620.  Minutes later, the bill passed the House of Representatives.  Ex. B at H3621.  The president signed it into law three days later.  *See* Ex. K.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" for enacting the law.  Like other *Arlington Heights* cases, passage of

24

the racially-motivated law followed a predictable pattern.  A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s.  *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks").  Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress.  *Compare McCrory*, 831 F.3d at 225 ("As one of the State's experts conceded [at trial], 'in North Carolina, African-American race is a better predictor for voting Democratic than party registration.'").  Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare McCrory*, 831 F.3d at 226 ("The State then elaborated on its justification, explaining that '[c]ounties with Sunday voting in 2014 were disproportionately black' and 'disproportionately Democratic.'  In response, SL 2013–381 did away with one of the two days of Sunday voting. Thus, in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race—specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise.") (citations omitted); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare").  Other legislators expressed similar sentiments.  *See id.*  And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. *Compare Democratic National Committee v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020) (finding that "good faith belief" of "sincere legislators" did not shield law from discriminatory, motivating factor under the "cat's paw" doctrine—where others convinced these legislators to act based on others' discriminatory motives).  In other words, the

25

evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—and seemingly readily exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

> D. "The legislature's departures from normal procedures or substantive conclusions."

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider the timing of the enactment of a law that could signal a discriminatory intent. *See Arlington Heights*, 429 U.S. at 268 ("For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case."). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See City of Yuma*, 818 F.3d at 507 (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[39] illegal reentry remains one of the few laws still in effect from that era.

---

[39] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Ex. B at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about Mexicans taking jobs, not Canadians. *See* Ex. B at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

### E. "The impact of the official action and whether it bears more heavily on one race than another."

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[40] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[41] And the number of prosecutions has soared—the number of § 1326 cases has risen over the past three years by nearly 40% to 22,077—making illegal reentry one of the most common felony federal crimes today.[42] The United States Sentencing Commission reported that

---

[40] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[41] Hernández, *supra* n.5, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36).

[42] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

in 2019, "99.0% of illegal reentry offenders were Hispanic, 0.7% were White, 0.3% were Black, and almost none were Other races."[43]   Nearly after its enactment, the crime of illegal reentry is being prosecuted in exactly the way that the legislators in the 1920s intended it to be used—to remove Latinos from the United States.

* * * * *

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act.  Because Mr. Palacios has shown a discriminatory purpose underlying § 1326, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered."  *Arlington Heights*, 429 U.S. at 266–68, 270 n.21.  *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor").  The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Palacios has not yet shown a discriminatory purpose), Mr. Palacios will present additional evidence at an evidentiary hearing on this motion.  Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors.  *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *McCrory*, 831 F.3d at 234.  Indeed, the Supreme Court has found error where a lower

---

[43] *Id.*

court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *See Hunt v. Cromartie*, 526 U.S. 541, 545 (1999).

CONCLUSION

Thus, at set forth above, Mr. Palacios moves the Court to find that his prior removal from the United States was constitutionally defective and to dismiss the indictment against him.

Respectfully submitted,
FRANCISCO EDGARDO PALACIOS ARIAS

By: _____/s/_____
      Laura Koenig
      Va. Bar No. 86840
      Counsel for Defendant
      Office of the Federal Public Defender
      701 E Broad Street, Suite 3600
      Richmond, VA 23219-1884
      Ph. (804) 565-0881
      Fax (804) 648-5033
      laura_koenig@fd.org