IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:20-CR-62 |
| | ) | |
| FRANCISCO PALACIOS-ARIAS, | ) | |
| | ) | |
| *Defendant*. | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS INDICTMENT

Comes now the United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, and Thomas A. Garnett, Assistant United States Attorney, and files this Response in Opposition to the defendant's *Motion to Dismiss Indictment* (Dk. No. 24).  For the following reasons, the motion should be denied.

## FACTUAL BACKGROUND

The defendant, FRANCISCO PALACIOS-ARIAS ("PALACIOS-ARIAS") was born in El Salvador in 1996, and is (and has been at all times) a citizen of El Salvador.  At an unknown location and on an unknown date in 2003, PALACIOS-ARIAS entered the United States without inspection by an immigration officer.

On July 7, 2017, officers of Immigration and Customs Enforcement (ICE) encountered the defendant while he was incarcerated in the Virginia Peninsula Regional Jail on several criminal charges.  On July 10, 2017, ICE officers arrested the defendant in Norfolk, Virginia.  Officers issued the defendant a Notice to Appear (known as an I-862), and charged him with being in violation of Section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA).  The defendant chose to retain counsel, and demanded a hearing before an Immigration Judge.

1

On September 14, 2017, following a contested hearing at which the defendant testified, the Immigration Judge ordered the defendant's removal to El Salvador.  The defendant (through counsel) appealed the Immigration Judge's ruling to the Board of Immigration Appeals.   The Board of Immigration Appeals (BIA) dismissed the defendant's appeal on February 28, 2018.  The defendant was subsequently removed from the United States on March 22, 2018, and issued a "Warning to Alien Ordered Removed or Deported" (known as an I-294).

On an unknown date after March 22, 2018, the defendant illegally reentered the United States without having been inspected by an immigration officer and without having received permission from the Attorney General of the United States or the Secretary of Homeland Security to reenter the United States.  On March 11, 2020, the defendant entered federal custody, having been indicted in this Court for one count of Illegal Reentry, in violation of 18 U.S.C. § 1326(a).

## ARGUMENT

The defendant's motion asserts two bases for relief.  The first is a claim that his retained counsel was ineffective at the defendant's civil immigration hearing in 2017, and that this deficient performance violated the defendant's right to due process.  Because the Fourth Circuit has flatly and consistently held that there is no right to effective assistance of counsel in a civil deportation hearing, the defendant's collateral attack on his 2017 removal must fail.

The defendant's second basis for relief consists of the assertion that Congress's enactment (in 1929) of a statute criminalizing illegal reentry was tainted by improper motives, and that this original discriminatory intent renders any subsequent Congressional immigration legislation unconstitutional.  Because the defendant's attempt to definitively discern and analyze the various motivations of the 500+ members of the 70th Congress conflicts with Supreme Court guidance

2

barring such speculation, and because Congress possesses plenary power to enact exactly such immigration legislation (in 1929, in 1952, and today), this claim also fails.

The United States addresses the defendant's arguments in turn below.

## I.     The Defendant's Collateral Attack on his Deportation Order Fails

The *Antiterrorism and Effective Death Penalty Act of 1996*, Pub. L. No. 104-132, 110 Stat. 1214 (1996), § 441, amended 8 U.S.C. § 1326 to allow an alien to collaterally attack a deportation order in certain, narrow circumstances.  A defendant may only collaterally attack the underlying removal order by showing:

(1) he has exhausted his administrative remedies to challenge that order;

(2) the removal proceedings improperly deprived him of an opportunity for judicial review; and

(3) entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d); *United States v. Ruiz-Gutierrez*, 118 Fed. Appx. 765 (4th Cir. 2005) (citing *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987)).

Section 1326(d) was "intended to insure that minimum due process was followed in the original deportation proceeding while preventing wholesale, time consuming attacks on underlying deportation orders."  140 Cong. Rec. S5558-01, S5571 (daily ed. May 11, 1994); *see also United States v. Sanchez-Peralta*, 1998 WL 63405 *2 (S.D.N.Y. 1998) (analyzing the 1996 amendments to § 1326).  The three requirements of § 1326(d) are stated in the conjunctive, and so a defendant must satisfy all three in order to prevail in a collateral attack.  *United States v. Ortiz*, 488 Fed. Appx. 717, 717–18 (4th Cir.  2012); *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005); *United States v. Roque- Espinoza*, 338 F.3d 724, 728 (7th Cir. 2003); *United States v. Wilson*, 316 F.3d 506, 509 (4th Cir. 2003); *United States v. Fernandez-Antonia*, 278 F.3d 150, 157

(2nd Cir. 2002).   To establish the statute's third requirement, that entry of the removal order was "fundamentally unfair," the defendant "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *El Shami*, 434 F.3d at 664 (internal quotations omitted).

### A. *The Defendant's Claim of Ineffective Assistance of Counsel is Not Cognizable*

Due process, in the context of an immigration hearing – that is, a *civil*, not criminal proceeding – "requires that aliens be given 'an opportunity to be heard at a meaningful time and in a meaningful manner, i.e., [to] receive a full and fair hearing on their claims.'" *Centeno-Rosales v. Barr*, 792 F. App'x 274, 275 (4th Cir. 2020) (quoting *Rusu v. INS*, 296 F.3d 316, 321-22 (4th Cir. 2002)).   "To establish a due process violation during removal proceedings, an alien must show: "'(1) that a defect in the proceeding rendered it fundamentally unfair and (2) that the defect prejudiced the outcome of the case.'"   *Id*. (quoting *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008)).   An alien's due process right at an immigration hearing safeguards his or her right to a fair and functional process and forum; it consists of "(1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." *El Shami*, 434 F.3d at 665 (internal quotations omitted).

The defendant's motion does not raise any complaint as regards his notice of the charges against him; he does not dispute that he was present at the deportation hearing and able to present evidence, testimony, and argument; he does not challenge any procedural or substantive aspect of the hearing; and he does not claim that the Immigration Judge's decision was factually or legally deficient.[1]

---

[1] Nor could he, as a review of the transcripts of the defendant's appearances before the Immigration Judge demonstrates.  The defendant's counsel sought an extension so as to be able to better prepare and present the defendant's arguments; the defendant is a fluent English speaker; the defendant enjoyed the assistance of counsel; the defendant was able to testify; the defendant

4

Instead, the defendant attempts to satisfy all three of the statute's mandatory prongs with one all-encompassing claim of *defense*, not government, error:  that his retained attorney performed poorly at the immigration hearing by (primarily) failing to present what the defendant asserts would have been a more legally compelling argument.  The defendant argues that his attorney's failure to present this particular argument doomed his chances of success before the Immigration Judge and (necessarily) rendered the Judge's deportation ruling "fundamentally unfair" (prong 3); prevented the defendant from relying on this legal argument before the BIA on appeal (prong 1); and made the prospect of appealing the BIA's dismissal to the Fourth Circuit pointless, thus excusing his failure to actually seek judicial review (prong 2).

His due process claim, then, rides entirely on the proposition that his attorney's errors – not any error actually imputable to the United States Government – can form the basis for a cognizable due process violation in the context of a civil deportation hearing.[2]

The law in the Fourth Circuit, however, is clear, uncontroverted, and to the contrary.[3]  An alien does <u>not</u> have a due process right to effective assistance of counsel at a deportation hearing.

---

was able to present exhibits and letters of support to the Immigration Court; and the Immigration Judge provided a detailed explanation of his findings and ruling.  *See* Def. Ex. M.

[2]  As a threshold matter, the defendant does not have a Sixth Amendment right to effective assistance at a civil removal hearing.  "[The defendant]'s ineffective assistance claim requires us to address whether the Constitution guarantees effective assistance of counsel to an alien in removal proceedings. It is well settled that removal proceedings are civil in nature, not criminal. It is equally well settled that *because removal proceedings are not criminal proceedings, aliens facing removal are not entitled to the Sixth Amendment's right to counsel*, nor to the associated right to effective counsel."  *Afanwi v. Mukasey*, 526 F.3d 788, 796 (4th Cir. 2008), *vacated on other grounds by Afanwi v. Holder*, 558 U.S. 801, 130 S.Ct. 350, 175 L.Ed.2d 4 (2009)) (footnote omitted) (emphasis added).

[3]  The defendant understands the futility of his claim, of course, which is why his motion cites primarily Ninth Circuit case law for the proposition that his retained attorney's errors should be imputed to the government.  *See* Def. Motion at 8.  The defendant's only citation to the Fourth Circuit is a 1989 opinion (*Figeroa v. U.S. I.N.S.*, 886 F.2d 76, 78 (4th Cir. 1989)) that considered a defendant's direct appeal to the Fourth Circuit upon the BIA's dismissal of his appeal.  *Figeroa*'s assumption – citing only out-of-circuit (primarily Ninth Circuit) cases, and devoid of any actual analysis – that an alien's attorney's ineffectiveness at a deportation hearing could constitute a due

*Afanwi v. Mukasey*, 526 F.3d 788, 796 (4th Cir. 2008), *vacated on other grounds by Afanwi v. Holder*, 558 U.S. 801, 130 S.Ct. 350, 175 L.Ed.2d 4 (2009)) ("[W]e hold today, contrary to some of our sister circuits, that retained counsel's ineffectiveness in a removal proceeding cannot deprive an alien of his Fifth Amendment right to a fundamentally fair hearing.").  This is so, the Fourth Circuit explained, because the actions of a privately retained counsel in a civil proceeding cannot be fairly or logically imputed to the federal government:

> Simply put, Afanwi's counsel was not a state actor, nor is there a sufficient nexus between the federal government and counsel's ineffectiveness such that the latter may fairly be treated as a governmental action.  To the contrary, Afanwi's counsel was privately retained pursuant to 8 U.S.C. § 1362, and his alleged ineffectiveness—namely his failure to check his mailbox regularly and to file a timely appeal—was a purely private act.  The federal government was under no obligation to provide Afanwi with legal representation, and there was no connection between the federal government and counsel's failure to check his mail.  Thus, Afanwi's counsel's actions do not implicate the Fifth Amendment, and accordingly counsel's alleged ineffectiveness did not deprive Afanwi of due process.

*Id.* at 799.

In *Afanwi*, the Fourth Circuit dealt with a far more substantive allegation of ineffective assistance of counsel – the attorney's failure to file an appeal to the BIA – than PALACIOS-ARIAS's claim that his attorney should have couched a legal argument differently.  The Fourth Circuit's holding confirmed that the claimed scope of or prejudice resulting from a privately retained attorney's failings are of no moment – no matter how purple his prose, a defendant cannot summon a due process right that simply does not exist:  "That Afanwi was denied an opportunity

---

process violation is no longer good law, having been flatly contravened in intervening decades by carefully considered Fourth Circuit opinions.  *Afanwi*, 526 F.3d at 796; *see also Massis v. Mukasey*, 549 F.3d 631, 637 (4th Cir. 2008); *Cruz v. Holder*, 321 F. App'x 280, 281 (4th Cir. 2009); *Rafiyev v. Mukasey*, 536 F.3d 853, 861 (8th Cir. 2008) (citing *Afanwi*, and similarly concluding "we hold that there is no constitutional right under the Fifth Amendment to effective assistance of counsel in a removal proceeding."); *United States v. Villarreal Silva*, 313 F. Supp. 3d 660, 678 (E.D. Va. 2018), *aff'd*, 931 F.3d 330 (4th Cir. 2019), *cert. denied sub nom. Silva v. United States*, 140 S. Ct. 571, 205 L. Ed. 2d 367 (2019).  The defendant does not mention these cases in his brief.

to petition this court for review of the BIA's [] Order may be unfortunate, but *it is not a constitutional violation, and it is only the latter that we may redress*.  Afanwi's petition for review must accordingly be denied with respect to his claim of ineffective assistance of counsel."  *Id.* (emphasis added).

**B.  *The Defendant's Collateral Attack Also Fails to Satisfy § 1326's Mandatory Prongs***

While the defendant's due process claim founders at the outset for lack of a legal foundation, and should be dismissed on that basis, the government notes that, regardless, the defendant's claims of ineffective assistances are unpersuasive and fail to satisfy § 1326's mandatory prongs.

The primary thrust of the defendant's argument is that his attorney failed to characterize the defendant's proffered social group as encompassing that of the defendant's family.  This purported failure, however, did not prevent the defendant from presenting the Immigration Court – with prompting from his attorney, and clear previous coaching from his stateside relatives – the information underlying the "family threat" claim: notably, that (1) an uncle had been kidnapped and held for ransom in 2001, and (2) that an aunt had been killed some 16 years later, in 2017.  To supplement the claim that these two events – occurring a decade and a half apart, in a country that the defense portrays as an unrelentingly violent and murderous place – demonstrate an unbroken, ongoing vendetta against the defendant's family, the defendant testified vaguely that "other relatives have been killed," and explained that his mother had told him that some men had expressed an interest in the defendant's whereabouts prior to his departure to the United States in 2003.  Def. Motion at 4.  The defendant's attorney also provided a statement drafted by the defendant's uncle in El Salvador for the court's consideration.  Def. Motion at 3, Exhibit M at 163.

The Immigration Judge did not dispute or challenge any of the defendant's assertions.  The Immigration Judge specifically noted the defendant's claim that his family ties placed him in jeopardy, and recognized the defendant's attorney's arguments to that same end:

> [The defendant] stated that he is afraid of returning to his home country.  He indicated that he fears being abducted.  He stated that when he was a little boy, and still living in El Salvador, he remembers being kept in the house and always protected.  He learned when he was older from his mother that his family was afraid that he'd be kidnapped, because there were threats made against his safety.  He stated that he does not know when, but he does know that his uncle was kidnapped at one point. . . . *He stated that he believes that family members, such as aunts and an uncle, have been killed because they possessed the Arias last name.* [ ]  He indicated that he is afraid of certain social groups that operated in El Salvador, *and he's afraid of individuals that have killed members of his family in the past*, although he has no idea who those individuals are.  [ ] *Respondent's attorney . . . sa[id] that the respondent has articulated a cognizable fear* of gang activity, *of individuals that harmed his family members . . .*

Exhibit M, at 2-6 (emphasis added).

In reaching his conclusion, the Immigration Judge considered the defendant's claim that "more likely than not that he'll be persecuted upon his return" because of his relationship to the "Arias family members."  The Judge also noted the defendant's apparent lack of interest in or knowledge of this purportedly dire threat, pointing out that "it is important to note that *it is the [defendant] who has to be able to explain* the entities that he's fearful of."  *Id*. at 8 (emphasis added).  A reading of the transcript confirms that the defendant's lackluster testimony undercut his attorney's efforts to demonstrate the defendant's concern about such a "family vendetta" threat.[4]

---

[4]  Asked about what he knew of his uncle's 2001 abduction, e.g., the defendant's response demonstrated his lack of interest in the subject matter, and sabotaged his attorney's ability to present the 2001 abduction as relevant evidence of the defendant's purported ongoing and present concern about the threat that his Arias surname presented: "Like I said, you know, she told me about the situation, but I was never – *I never asked any further because I felt like – okay, well, that's in the past*, and I left it at that."  Exhibit M, at 21 (emphasis added).  Likewise, repeating his mother's assertions that "some family members that were [ ] killed in El Salvador," the defendant's obvious lack of interest in the matter precluded his ability to expand upon those claims: "And that's all I asked.  I asked why, and [his mother] said it had something to do with the last name, and that was about it."  *Id*. at 26.

8

As the Immigration Judge aptly noted, it was the *defendant's* responsibility – his burden – to demonstrate that he possessed a plausible and concrete fear of the consequences of deportation. Despite receiving obvious coaching from his family members, the defendant could not muster any particularized description of the purported (family-tie-based) threat awaiting him in El Salvador, or provide anything other than the vaguest summaries of harm done to some unknown family members, somewhere, on some unknown dates. The defense recognizes that the defendant was a non-compelling witness on his own behalf, and so seeks a do-over in order to supplement his lackluster testimony with that of his relatives; the defendant characterizes his attorney's decision not to call those individuals as another ground of error.[5] But the concerns of the defendant's relatives were not the relevant inquiry in 2017, nor are they now. The defendant was responsible for articulating his reasons against removal, as any alien – including those individuals *without* the financial, family, and legal resources the defendant enjoyed – is expected to do. The defendant had ample time to consider and rehearse his testimony, and he had the assistance of an attorney to coax him through the presentation of that testimony and object on the defendant's behalf during the subsequent cross-examination. The defendant was responsible for explaining his purported fear of returning to El Salvador to the Immigration Court. He failed to do so.[6]

---

[5]   The defendant claims this testimony would have consisted of the defendant's uncle's account of his 2001 abduction, and "[Mr. Granados'] experiences and how those impacted Mr. Palacios." Def. Motion, at 4-5. The transcript makes clear that this testimony would have been both cumulative (again, there was no dispute that Mr. Granados had been abducted in 2001, and the defendant's attorney had submitted an affidavit to that effect that the Immigration Court received into evidence (*see* Ex. L, at 15)) and irrelevant: the person best qualified to talk about how Mr. Granados' "experiences impacted [*the defendant*]" would be, in fact, the *defendant*. The defendant enjoyed the opportunity to elaborate on precisely this subject during his testimony, and his account as to the effect the 2001 abduction had on him speaks for itself (see above). Similarly, the defendant's claim that his mother's testimony would have been helpful to further illuminate the September 2001 abduction ignores the fact that his mother had no firsthand knowledge of either the abduction or the "lengths the family had taken to protect [the defendant]," having left El Salvador for the United States some 7 months prior. Def. Motion, at 3-5.

[6] The defendant's remaining assignments of error are likewise unpersuasive. The defendant's claim that his case was prejudiced by the lack of an English translation of the police

In sum, the defendant enjoyed the services of an attorney; he was able to present evidence and argument to the Immigration Court; he had the opportunity to testify at length about his purported bases for remaining in the United States; his hearing was free of any procedural or substantive defect; and the Immigration Judge considered the defendant's arguments, testimony, and evidence carefully and at length in delivering his ruling.   The entry of the defendant's deportation order in 2017 was not "fundamentally unfair," as required by § 1326(d)'s final prong.

Finally, the defendant's motion could not have satisfied the second of that statute's mandatory prongs, because he was not deprived of the opportunity for judicial review.  To his credit, the defendant does not attempt to claim that he was actually deprived of the *opportunity* to appeal to the Fourth Circuit in 2017; instead, conscious of his failure to take that necessary (and available) step, the defendant argues in conclusory fashion that any appeal would have been "pointless" or "futile."  But the defendant's prognostications as to the Fourth Circuit's likely legal conclusions sidesteps the statute's actual requirement:  that the defendant have been "improperly deprived . . . of an *opportunity* for judicial review."  18 U.S.C. § 1326(d) (emphasis added); *see also United States v. Mejia*, 671 F. App'x 161, 161–62 (4th Cir. 2016) ("Ramirez first claims that he is not barred by the exhaustion requirement set forth in 8 U.S.C. § 1326(d)(1) because exhaustion in this case would have been futile.  Statutory exhaustion requirements such as that set forth in § 1326(d) are mandatory, and courts are not free to dispense with them.") (internal citation

---

report concerning his uncle's 2001 abduction fails to explain how, exactly, that would be so.  The Immigration Judge had already accepted the defendant's claim as to the abduction; the government had not challenged it; and the police report makes no mention of the kidnappers' motive(s) or any then-extant threat to other members of the abductees' families.  *See* Def. Ex. K.  The defendant also faults his attorney's decision to request a Spanish interpreter for the defendant, because the defendant "speaks fluent English and did not need an interpreter."  Def. Motion, at 5.  Of course, at the time that the defendant's attorney requested an interpreter's services on August 17, 2017, he had not <u>met</u> the defendant, and did not know the defendant's level of fluency.  Dk. No. 24-14, at 3, 6.  His request for an interpreter was thus appropriate, a precautionary measure to ensure the defendant would be able to participate in the subsequent hearing.

and quotation marks omitted).  No one – not his attorney, nor any branch or organ of the United States Government – deprived the defendant of the opportunity to file an appeal to the Fourth Circuit, as required by § 1326(d).[7]  The defendant's failure to exhaust judicial review also (and independently) dooms his collateral attack.

## II.    The Defendant's Equal Protection Challenge Fails

The Supreme Court has made clear that the judiciary cannot strike down an act of Congress on the basis of an alleged illicit legislative motive.  Without citing this "familiar principle of constitutional law," the defendant urges this Court to violate it.

### A.  *Statutory Background*

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.  However, there was no penalty, other than repeated deportation, for reentering after deportation.  Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[8]  The Senate Report from the Committee on Immigration outlined the purpose of the law:

---

[7]    The United States notes also that the defendant's asserted basis for his attorney ineffectiveness claim – that his retained counsel had not advanced a particular legal argument – was no less available as of the date of the BIA's dismissal of his appeal in 2017 than it is today. The defendant could have advanced his ineffectiveness argument to the Fourth Circuit then, but simply chose not to do so; very possibly, his attorneys realized that any such claim would be foreclosed by controlling Fourth Circuit precedent.

[8]    The text stated,

        [I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the proposed illegal reentry crime and stated, "It is believed that such a statute would be of material aid in enforcing our immigration laws." *Id.*

The Secretary of the Department of Labor—charged at that time with enforcing the country's immigration laws—agreed. In a letter made part of the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. . . . Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163

---

penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years of by a fine of not more than $1,000, or by both such fine and imprisonment.

(introduction).[9] In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien. The text stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated § 1326 multiple times—and always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181.  Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed"). Congress' continual strengthening of § 1326's deterrent value "suggests a crystallizing vision on Congress's

---

    [9]   By 1952, the antagonists cited in the defendant's motion were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or no longer alive (Coleman Blease, James Davis, John Box, Harry Laughlin).

part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir.2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014).

**B.**     ***The Defendant Fails to Establish an Equal Protection Violation***

The Court should deny Defendant's motion to dismiss.  Immigration laws are subject to a highly deferential standard of review.  With the proper standard in view—requiring Defendant, for instance, to negate "every conceivable basis which might support" the illegal-entry law—Defendant's claim fails. The motion likewise fails because it ignores the Supreme Court's prohibition against probing alleged illicit legislative motives.

1.     *Congress's immigration laws are subject to rational-basis review*

Congress's legislative power in the arena of immigration law is plenary: "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  *Johnson v. Whitehead*, 647 F.3d 120, 126–27 (4th Cir. 2011) (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) (internal citation omitted).  Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976).  Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context); *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000) ("[J]udicial review over federal immigration legislation has always been limited.").

14

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972).  In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. 408 U.S. at 756-57.  The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65.  But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769.  Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770.

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision-making.  In *Fiallo*, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children.  430 U.S. at 795.  In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy.  In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795.  In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted).   The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative

decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Fourth Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test requires courts to apply rational basis review when considering matters of immigration and naturalization. *Whitehead*, 647 F.3d at 127 (citing to *Fiallo*'s application of rational basis review, and concluding that, consistent "with our sister circuits," the Court was bound to apply rational basis review) (internal citations omitted).  When assessing the legitimacy of a statute addressing immigration, the Fourth Circuit explained in *Whitehead*, "our role is not to second-guess the judgment of Congress.  Rather, the question is whether the statute is supported by a rational basis."  *Id.*; *see also Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) (addressing classifications typically subject to more exacting scrutiny, such as national-origin, in noting that "when such classifications involve unadmitted aliens in the immigration context, we subject them only to rational basis review . . . This is so because Congress has plenary power over immigration and naturalization, and may permissibly set immigration criteria based on an alien's nationality, even though such distinctions would be suspect if applied to American citizens.") (internal quotations and citations omitted).[10] The same standard applies to criminal statutes.  *See United States v. Khan*, 461 F.3d 477, 495 (4th Cir. 2006) ("Defendants acknowledge that § 924(c) violates the Equal Protection and Due Process clauses only if they can demonstrate that the statute lacks a rational basis.").

2.      *Section 1326 satisfies rational-basis review*

The rational-basis test "is quite deferential.  It simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals."

---

[10] Regardless, the Supreme Court has made clear that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982).

*Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013).  The test is met where "there is a rational relationship between the disparity of treatment and some legitimate govern-mental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

As the background above outlines, and as common sense informs, the government has a legitimate interest in deterring illegal reentry.  And there is a clear rational relationship between that interest and § 1326, which provides sanctions for – that is, actual *deterrence* of – repeated violations of the United States' immigration laws.  *See, e.g.*, *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."); *see also United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991) ("8 U.S.C. § 1326 is designed to effectively enforce the immigration laws.").  As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."  *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (citing *Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)).  That is clearly not the case here with § 1326—a law seeking to deter all aliens from illegally reentering the country following deportation.

The defendant cites the higher percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those

numbers are a product of geography, not discrimination.  For instance, in FY19, Border Patrol had 859,501 total encounters.  *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (851,508) occurred on the southwest border.  *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.  Those numbers are neither surprising nor illuminating of Congress' motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program.  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted);[11] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").  In fact, the Ninth Circuit has rejected just this sort of statistics-based argument in the context of affirming the denial of a motion to compel discovery with regards to a selective prosecution claim:

> Simplified, Sullivan's proposition is that selective prosecution may be inferred because 94.5% of § 1326 defendants are Hispanic males, while only 89% of persons deported from the United States are Hispanic. This statistic is probative of the treatment of similarly situated individuals only if one assumes that deported individuals of different ethnic origins return to the United States at relatively equal

---

[11]  For this same reason, the defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* Defense Motion at 27-28.

rates, and therefore that Hispanics comprise 89% of individuals illegally re-entering the United States. As the district court aptly noted, however, common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so.

*United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003).[12]

3.    *The Defendant's Reliance on Arlington Heights is Misplaced*

The defendant relies almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).  That case, which involved a rezoning request to accommodate the placement of low-income housing—"which would probably be racially integrated" (*id.* at 258)—is inapplicable here.  Indeed, the defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress.  And for good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799.  There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history."  429 U.S. at 267-68.  That does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

---

[12] The Ninth Circuit has also held that punishing illegal reentrants more severely than other felons with the same criminal records does not violate equal protection. *See United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (holding that U.S.S.G. § 2L1.2's 16-level enhancement for those who violate  § 1326 does not violate equal protection); *see also United States v. Ramirez-Garcia*, 269 F.3d 945, 947-948 (9th Cir.2001) (§ 2L1.2 properly implements Congress's desire "to enhance the penalties for aliens with prior convictions in order to deter others[ ]" by increasing the "sentencing range for aliens with prior convictions.").  The Fourth Circuit has adopted *Ruiz-Chairez* and denied equal protection challenges to § 2L1.2 on at least two occasions. *See United States v. Alvarez-Aldana*, 554 F. App'x 225, 226-7 (4th Cir. 2014); *United States v. Alejo-Pena*, 474 F. App'x 137, 138 (4th Cir. 2012).

19

In fact, the Supreme Court explicitly forbids the type of congressional motive-probing urged by the defendant. *United States v. O'Brien*, 391 U.S. 367 (1968), makes that clear. There, O'Brien burned his selective service registration certified and was convicted under a 1965 law criminalizing such behavior. *Id.* at 370. On appeal to the Supreme Court, O'Brien argued that the 1965 law was unconstitutional because the "purpose" of Congress was to suppress freedom of speech. *Id.* at 382-83. The Supreme Court swiftly rejected this argument, noting "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statue on the basis of an alleged illicit legislative motive." *Id.* at 383. The Court cited a 1904 Supreme Court case which stated:

> The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.

*Id.* (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904).

The *O'Brien* Court noted that the judiciary *can* look to statements by legislators "[w]hen the issue is simply the interpretation of legislation." *Id.* But outside that context, the Court found that it had no authority to probe claimed motives of Congress. Speaking directly to the issue raised in the defendant's motion, the Court stated,

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*Id.* at 384 (emphasis added); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) ("Respondent's argument that the ordinance is "aimed" at suppressing expression through a ban on nude dancing . . . is really an argument that the city council also had an illicit motive in enacting

the ordinance. As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.") (citing *O'Brien*); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.") (citing *O'Brien* and other cases); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) ("The Supreme Court has held that an otherwise constitutional statute will not be invalidated on the basis of an 'alleged illicit legislative motive,' and has refused to inquire into legislative motives.") (citing *O'Brien*); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n. 29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (citing *O'Brien*). *O'Brien* flatly prohibits the inquiry the defendant urges the Court to make. This ends the matter altogether.

In any event, the defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that § 1326 has been updated or modified—each time strengthened—multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.

The defendant's motion simply ignores this lengthy congressional record, preferring to focus on selected legislators' comments from the 1920's (and sweeping academic denunciations of some of the attitudes of that decade). Under the defendant's view, in effect, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below— is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that

21

"carr [ies] over" from one law to the next.  *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (pl. op.) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Thompson*, 403 U.S. at 225 (citing *O'Brien*; noting "there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters" because, among other reasons, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons").

But even assuming Arlington Heights applies in this case, it only gets the defendant so far. Even if the Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a substantial or motivating factor behinds the law's enactment, the burden would then "shift[] to the law's defenders to demonstrate that the law would have been enacted without this factor."  *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016). That burden is easily met here, where there is no challenge to Congress' subsequent enactments as being discriminatory.  Indeed, we do not have to speculate whether a statute criminalizing illegal reentry would have been enacted without the purported discriminatory motives of a handful of 1920's legislators:  it *was*, and several times over.  So, even if we accept the worst about the original Congress that enacted the legislation, 18 U.S.C. § 1326 would still not violate the Equal Protection Clause.

This approach accords with post-*Arlington Heights* cases, which recognize, for example, that while the historical background of a decision is one source of evidence for proof of intentional discrimination under *Arlington Heights*, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n. 20 (1987); *see also id*. at 298 n. 20 ("Although the history of racial

discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent.").  Since *Arlington Heights*, the Supreme Court has rejected the "taint argument" in an analogous setting:

> [P]etitioners note that Proposition 15, the initiative out of which § 25524.2 arose, and companion provisions in California's so-called nuclear laws, are more clearly written with safety purposes in mind.  It is suggested that § 25524.2 shares a common heritage with these laws and should be presumed to have been enacted for the same purposes.  The short answer here is that these other state laws are not before the Court, and indeed, Proposition 15 was not passed; these provisions and their pedigree do not taint other parts of the Warren-Alquist Act.

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 215–16 (1983).  Similarly, in *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), the Court explained that "the presumption of legislative good faith [is] not changed by a finding of past discrimination." Other courts have recognized these principles in a variety of contexts, both criminal and civil.  *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202, 1228-29 (11th Cir. 2020) ("We are mindful of the danger of allowing the old, outdated intentions of previous generations to taint Alabama's legislative action forevermore on certain topics. Plaintiffs point to the racist history of Alabama as a significant barrier for Secretary Merrill to overcome in defending this law. But it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting."); *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994) ("Appellants urge us to ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of information.  They point first to the undeniable racism that animated legislative debate leading to the passage of a 1914 statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated.  We think this information is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act."); *see also id.* ("it would be anomalous to attempt to tar the present Congress with the racist brush of a

pre-World War I debate."); *Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986) ("We reject plaintiffs' argument that the Norfolk school board must continue to justify all of its actions because of the history of segregation. While that history of discrimination cannot and should not be ignored, it 'cannot in the manner of original sin, condemn governmental action that is not itself unlawful.'" (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980)); *accord Watkins v. Angelone*, 133 F.3d 920 n.3 (4th Cir. 1998).

It is for this reason that several courts of appeals have recognized that, when a state reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir. 2005) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming that: (1) the defendant's "forever unclean" position is permissible, (2) it is permissible for the Court to probe the motives of Congress; and (3) *Arlington Heights* applies to probe the justifications of Congress' immigration actions, the defendant's claim still fails. To begin, the defendant fails to show a cognizable disparate impact. As outlined above, the statistics the defendant cites for disparate impact are a feature of Mexico's proximity to the United States—not discrimination. That alone is enough to reject the defendant's *Arlington*

24

*Heights* analysis. *See, e.g., Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds"); *see also Arenas-Ortiz*, 339 F.3d at 1070.

Moreover, the defendant's perspective that early immigration laws, leading to the 1929 illegal reentry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some — Asia, for instance — the quota system completely excluded immigration. *See* https://history.state.gov/milestones/1921-1936/immigration-act. This hardly comports with the defendant's view that Congress was actively developing legislation with the intent and purpose of discriminating against persons from Mexico; on the contrary, the absence of Mexicans from the 1924 Act demonstrates that economic considerations (the need for an agricultural labor force) trumped the supposed driving engine of racial animus and eugenics.[13]

Digging slightly deeper into the defendant's claims reveals they are misleading. Indeed, the defendant selectively edits quotations from the Congressional record to support his theory. For

---

[13] Likewise, the supposed import of Dr. Laughlin's eugenics discussion (during a 1926 House hearing) withers under basic scrutiny, by the defendant's own admission: "Chairman Johnson's initial legislation failed." Defense Motion, at 23. Three years would pass between Dr. Laughlin's (admittedly odious) House testimony and the 1929 *Senate*-drafted bill addressing illegal reentry. The Senate passed the legislation, the defendant acknowledges, "with almost no discussion or debate," rendering any attempt to retroactively diagnose the various potential rationales and motivations of those 96 senators as futile as it would be ill-advised. *Id.*

25

instance, the defendant says that Rep. Thomas L. Blanton "complained that Mexicans 'come into Texas by hordes[.]'" ECF No. 29 at 16.  But the full context shows Rep. Blanton was discussing the need to preserve jobs for American citizens.  Indeed, just moments later, Rep. Blanton stated, "They are taking away jobs from American citizens."  70 Cong. Rec. 3619 (1929).

    As another example, the defendant states that Rep. Blanton "urged the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there."  Defense Motion, at 24.   The defendant omits the very next sentence, which again is directly tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

    As yet another example, the defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'" *Id.*   The defendant inserted a period at the end of that quote, but it was actually a comma. The full quote—again, focused on economic harms—reads:

> If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges . . . [a]nd stand there, he will see the hordes that come across the bridges with no intention of ever going back, *coming across to get jobs of Americans*, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

70 Cong. Rec. 3619 (1929).

    Likewise, the defendant cites some startling comments of Rep. John Box, but the defendant omits his comments during the congressional debate regarding the job problems facing his constituents in Texas. "They do take the places of American workmen, who are already put to it

26

to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now." *Id.*

And again, the defendant cites a speech given by Rep. Robert Green in January 1928, seizing upon several startling snippets. The complete speech shows Rep. Green was not targeting Mexicans. Rather, Rep. Green outlined his broad immigration policies, seeking a general strengthening of immigration law.  Rep. Green saw a "tremendous situation" facing immigration authorities. 69 Cong. Rec. 2461 (1928).  He observed that "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States." *Id.*  He noted that the "immigration department" employed only 2,700 people, which was "inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol." *Id.*  Rep. Green stated that 113,105 aliens were "inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses." *Id.*  He continued, "[t]he economic loss represented by these figures is appalling." *Id.*  Rep. Green spoke at length about the "communists" and "bolshevists"—not Mexicans—"here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our homes." *Id.* at 2462.  He also spoke about immigration from Mexico, stating "hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises." *Id.*  He also stated—regrettably, but clearly not singling out Mexicans—that it was "time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores." *Id.*

The point is not that these several Congressmen did not say things they shouldn't have.  It is that indulging even briefly in the defendant's desired probe of the Congressional record reveals a more complicated, multi-dimensional picture than the flat caricature he paints.  The endeavor also reinforces the Supreme Court's caution—leading to the prohibition against probing motives—

that "it is extremely difficult for a court to ascertain the motivation, or collection of difference motivations, that lie behind a legislative enactment." *Palmer*, 403 U.S. at 224.   For "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *O'Brien*, 391 U.S. at 384.

At the conclusion of the *Arlington Heights* analysis the defendant claims the government would have to show that the contested law would have passed "even had the impermissible purpose not been considered."  Def. Motion at 28 (citing *Arlington Heights*).  There is no need to reach this point.  Still, Congress *did* pass a new illegal reentry law in 1952, which was later amended multiple times.  The defendant does not suggest any discriminatory purpose with those pieces of legislation. The Supreme Court has noted that "[e]valuating the legality of acts arising out of mixed motives can be complex, and affixing a single label to those acts can be hazardous, even when the actor is an individual performing a discrete act. When the actor is a legislature and the act is a composite of manifold choices, the task can be even more daunting." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006).  It has further noted that courts "should be skeptical, however, of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted." *Id*.  At bottom, this is exactly what the defendant is doing.  The defendant does not engage with the substance of the law or its clear and obvious purpose.  Rather, the entirety of his motion is aimed at legislative history that is several times removed.  In the same way that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Guar. Corp. v. LTV Corp*., 496 U.S. 633, 650 (1990) (internal quotation marks omitted), the legislative history of an earlier Congress cannot forever taint a law that has been reenacted repeatedly.

28

Finally, although already scheduled, the United States notes that there is no actual need for an evidentiary hearing as to either of the defendant's claims. The defendant's arguments are flatly foreclosed as matters of law: his ineffective assistance of counsel claim lacks a viable legal vehicle, and his equal protection claim demands (and requires) an impermissible and unnecessary inquiry into Congressional intent. *See, e.g.*, *United States v. Irwin*, 612 F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

## <u>Conclusion</u>

For the foregoing reasons, the defendant's *Motion to Dismiss* should be denied.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:  _____/s/_____

Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone:  (804) 819-5400
Telefax: (804) 771-2316
Thomas.A.Garnett@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 18, 2020, I electronically filed a copy of the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to all counsel of record.

_____/s/_____
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone:   (804) 819-5400
Telefax: (804) 771-2316
Thomas.A.Garnett@usdoj.gov
