IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:20cr62

FRANCISCO EDGARDO PALACIOS-ARIAS,
Defendant.

## OPINION

This matter comes before the Court following a Fourth Circuit remand on Defendant Francisco Edgardo Palacios-Arias's motion to dismiss the indictment.  The parties submitted supplemental briefs on July 1, 2022, and the Court held a hearing on the matter on August 17, 2022.[1]

Palacios-Arias seeks to vacate his 2021 conviction for illegal reentry by challenging the validity of his prior deportation order.  Pursuant to 8 U.S.C. § 1326, Palacios-Arias may collaterally attack his prior deportation order provided that (1) he has "exhausted any administrative remedies that may have been available to seek relief against the order"; (2) the deportation proceeding "improperly deprived" him of "the opportunity for judicial review"; and (3) "the entry of the order was fundamentally unfair."  8 U.S.C. § 1326(d).  On remand, Palacios-Arias argues that (1) he exhausted his administrative remedies by filing an appeal with the Board of Immigration Appeals ("BIA"), and that (2) his immigration attorney's ineffective assistance deprived him of the opportunity for judicial review and rendered the entry of his deportation order fundamentally unfair. (*See* ECF No. 60, at 8–9, 16–19.)

---

[1] The Court held evidentiary hearings on the original motion to dismiss the indictment on October 6 and 8, 2020.  (ECF No. 36.)

Upon careful review of the record, the Court finds that the dipositive issue in this case is whether Palacios-Arias received ineffective assistance of counsel. As explained below, the Court finds that Palacios-Arias suffered no prejudice due to his attorney's alleged errors during his September 2017 removal hearing. Accordingly, his ineffective assistance claim lacks merit. Because Palacios-Arias did not receive ineffective assistance of counsel, he fails to satisfy the mandatory requirements of § 1326(d)(2)–(3).[2] The Court will thus deny his motion to dismiss the indictment.

## I. PROCEDURAL HISTORY

On June 17, 2020, the grand jury returned a one-count criminal indictment charging Palacios-Arias with illegal reentry. (ECF No. 16.) On August 14, 2020, Palacios-Arias moved to dismiss that indictment, arguing that his prior removal from the United States "was constitutionally defective" because his immigration attorney provided ineffective assistance of counsel during his removal hearing.[3] (ECF No. 24, at 1.) The Court rejected Palacios-Arias's argument on October 13, 2020, finding that no futility exception exempted Palacios-Arias from fulfilling the mandatory statutory requirement of § 1326(d)(2).[4] (*Id.* at 2–3.) Palacios-Arias entered a conditional guilty plea on December 2, 2020, and the Court sentenced him to 24 months' imprisonment on January

---

[2] Because the Court finds that Palacios-Arias did not receive ineffective assistance of counsel, the Court declines to address his argument that he exhausted all available administrative remedies by filing an appeal to the BIA. *See infra* Sec.III.C.

[3] Palacios-Aris also argued that 8 U.S.C. § 1326—the illegal reentry statute—violates the Constitution's Equal Protection Clause. (ECF No. 24, at 1.) In denying that aspect of his motion, the Court found that § 1326 satisfied both rational basis review and heightened scrutiny under *Arlington Heights*. (ECF No. 37, at 4, 7 (citing *Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)).) Reconsideration of this issue is not before the Court on remand. *See infra* note 7.

[4] Because the Court found that Palacios-Arias "failed to show that he lacked 'the opportunity for judicial review,' the Court [did] not address § 1326(d)'s other two prerequisites for collaterally attacking a deportation order." (ECF No. 37, at 3 n.3 (quoting 8 U.S.C. § 1326(d)(2).)

8, 2021, with credit for time served.[5]  (*See* ECF Nos. 40, 50.)  He appealed this Court's denial of his motion to dismiss the indictment the same day.  (ECF Nos. 52, 53.)

On April 20, 2022, the Fourth Circuit remanded the case to this Court.  (*See* ECF No. 56.) Based on the Supreme Court's holding in *United States v. Palomar-Santiago*, 141 S. Ct. 1615 (2021), the Fourth Circuit affirmed this Court's holding that no "extrastatutory [futility] exception" to the three requirements of § 1326(d) exists.  (*Id.* at 3.)  The Fourth Circuit found, however, that the Court did not address the "distinct argument" that Palacios-Arias's "counsel's ineffectiveness *satisfied* the requirements to further exhaust any administrative remedies available and deprived him of the opportunity for judicial review."  (*Id.* at 3–4 (emphasis added).)[6]  On that basis,[7] the Fourth Circuit vacated the Court's judgment and remanded the case so that this Court could consider the parties' arguments on the ineffective assistance of counsel issue.[8]

---

[5] Palacios-Arias was released from Bureau of Prisons custody on November 19, 2021.  He is currently in immigration custody.

[6] *See also Palomar-Santiago*, 141 S. Ct. at 1622 n.4 (declining to decide any of Palomar-Santiago's "freestanding constitutional claims" with the administrative process because he did not raise them below).

[7] Because the Fourth Circuit vacated the Court's judgment and remanded on those grounds, it did not address Palacios-Arias's argument about the constitutionality of § 1326.

[8] In a First Circuit case, a defendant petitioned the Supreme Court for a writ of certiorari to decide whether "ineffective assistance of counsel" satisfies the requirements of § 1326(d).  The Supreme Court denied the petition on October 3, 2022.  *See Castillo-Martinez v. United States*, ___ S. Ct. ___, 2022 WL 4652351 (2022) (mem.).

## II. FACTS[9]

Palacios-Arias was born in El Salvador in 1996. (*See* ECF No. 60-1, at 63.) After several members of his family, including his mother, immigrated to the United States, Palacios-Arias moved in with his aunt. (ECF No. 60-2, at 179–80.) In September 2001,[10] unknown gang members kidnapped Palacios-Arias's then-sixty-one-year-old uncle Miguel Arias.[11] (ECF No. 60-2, at 173–75, 180–82.) Miguel Arias's family eventually paid a ransom, and the kidnappers released him after holding him hostage for twelve days. (*Id.* at 174, 177–78, 184.) Miguel Arias did not know exactly who kidnapped him, but he assumed they were affiliated with a local gang.[12] (*Id.* at 175.) Palacios-Arias's aunt later found a note on the door to her home asking, "who the boy [(Palacios-Arias)] belonged to." (*Id.* at 182.) Around the same time, she saw gang letters and symbols on a wall outside of her home. (*Id.* at 183.) Fearing for Palacios-Arias's safety, his aunt "decided not to let [Palacios-Arias] go out any more." (*Id.* at 182.) In 2003, Palacios-Arias immigrated to the United States. (ECF No. 60-1, at 63.)

Palacios-Arias was still living in the United States when the Department of Homeland Security served him with a notice to appear in removal proceedings on July 10, 2017. (ECF No. 60, at 3.) His family hired a private attorney, Juan Ruiz, to represent him at the removal hearing. (ECF No. 60-2, at 185–86.) Ruiz applied for asylum and withholding of removal on Palacios-

---

[9] Because the joint appendix comprises many distinct records, (ECF Nos. 60-1, 60-2), this section employs the pagination assigned by CM/ECF docketing system.

[10] At the time, Palacios-Arias was approximately five years old and living with his aunt. (ECF No. 60, at 2.)

[11] Both Palacios-Arias and his mother refer to Miguel Arias as their "uncle." The Court assumes that Miguel Arias, who is over the age of eighty years old, is Palacios-Arias's great uncle.

[12] At some point following Miguel Arias's release, El Salvadorian authorities arrested, tried, and convicted his kidnappers. (*Id.* at 175–76.)

Arias's behalf in September 2017. (ECF No. 60-1, at 62.) Because Palacios-Arias filed his asylum application more than a year after he entered the United States, it was untimely. *See* 8 U.S.C. § 1158(a)(2)(B). Notably, a person may apply for asylum beyond the one-year deadline upon a showing of "the existence of changed circumstances which materially affect the applicant's eligibility for asylum." *Id.* § 1158(a)(2)(D). Approximately one month before Palacios-Arias's removal hearing, gang members fatally shot his aunt Juana Arias and severely beat her father. (ECF No. 60-1, at 119; ECF No. 60-2, at 184–85.) Ruiz did not argue that the murder constituted "changed circumstances" which rendered Palacios-Arias's asylum application timely. (ECF No. 60, at 17; ECF No. 60-2, at 65.) He did, however, include a newspaper article describing the murder of Juana Arias with the asylum application. (ECF No. 60-1, at 119.) Ruiz also included a court document from Palacios-Arias's uncle's kidnappers' criminal case in Spanish. (*Id.* at 118.) But he did not ask Palacios-Arias's family to translate the court document into English. (ECF No. 60-2, at 188.)

In preparing for the hearing, Ruiz also spoke with Palacios-Arias's mother and asked her to bring Palacios-Arias's uncle to the removal hearing.[13] (*Id.* at 186.) Palacios-Arias's mother and uncle arrived at the removal hearing early and, right before it started, told Ruiz that they were present and ready to testify. (*Id.* at 187.) After acknowledging their presence and willingness to testify, Ruiz went into the courtroom. (*Id.*)

Before the proceeding began, the immigration judge swore in a staff Spanish interpreter. (ECF No. 60-2, at 15.) The immigration judge released the interpreter, though, after Palacios-Arias told the immigration judge that he "prefer[ed to] . . . continue in English." (*Id.* at 17.)

---

[13] Whenever Ruiz communicated with Palacios-Arias's mother, Palacios-Arias's mother's daughter interpreted. (*Id.*)

Shortly thereafter, the immigration judge struck the untranslated "criminal court case document detailing [Palacios-Arias's uncle's] kidnapping." (ECF No. 60, at 13; ECF No. 60-1, at 80–111; ECF No. 60-2, at 19–20.) Ruiz acquiesced and stated that another exhibit "ma[de] reference to the content of [the stricken] document," which made "[them] comfortable proceeding" without it. (ECF No. 60-2, at 19–20.) Palacios-Arias testified, but Ruiz never called Palacios-Arias's uncle or mother to the stand. (*Id.* at 177, 188.) The immigration judge thus only heard "very generally from Mr. Palacios and the short English translation of an article about his aunt's murder that his uncle had been kidnapped, that his family was fearful for his safety because of a note, and that his aunt had been murdered shortly before his removal hearing." (ECF No. 60, at 14 (citing ECF Nos. 60-1, at 119; ECF No. 60-2, at 24–27).)

At the end of the hearing, the immigration judge denied Palacios-Arias's application for relief and ordered him removed. (ECF No. 60-2, at 62, 64–75.) She considered only his applications for withholding of removal and withholding of removal under the Convention Against Torture ("CAT") because Palacios-Arias conceded that he untimely filed his asylum application. (*Id.* at 65.) As to his withholding of removal application, the immigration judge found that Palacios-Arias had not "articulated a particular social group" and that he had not shown "any explanation of a harm that [he] will sustain by some kind of cognizable entity in El Salvador." (*Id.* at 70–72.) She further emphasized that his "generalized fears of violence, criminal activity, and the unknown" did not suffice to show cognizable harm, and that he also did not show "past persecution." (*Id.* at 72.) Finally, although he did not specifically assert that his membership in the Arias family constituted a social group, the immigration judge recognized that she could not grant relief "based on [Palacios-Arias's] speculations that some individuals that are responsible for harming Arias family members would now be interested in harming him." (*Id.* at 71.) Under the CAT, she

6

found that Palacios-Arias "set forth absolutely no facts or circumstances to show that it is more likely than not that he[ would] be tortured if forced to return to El Salvador." (*Id.* at 72.)

Following the hearing, Palacios-Arias hired a new attorney, Nash Joseph Fayad, to timely appeal the immigration judge's decision to the BIA. On appeal, he argued that the immigration judge erred (1) in finding that his proposed social group—"Salvadorian adult males, who were raised and lived in the U.S. since middle childhood"—was not cognizable; (2) by "failing to conduct factfinding regarding alternative protected grounds[, such as family status,] that may have been established by [Palacios-Arias's] testimony"; and (3) "by disregarding crucial evidence in denying [Palacios-Arias's] application for protection under the [CAT]." (*Id.* at 77–78, 82–90.)

On February 28, 2018, the BIA dismissed Palacios-Arias's appeal. Specifically, the BIA affirmed the immigration judge's conclusion that Palacios-Arias's proposed social group lacked "particularity and social distinction"; found that Palacios-Arias failed to "articulate family . . . in his proposed particular social group"; concluded—"as the [i]mmigration [j]udge" did—that Palacios-Arias "presented insufficient evidence that he is likely to be harmed in El Salvador on account of his family membership"; and affirmed the immigration judge's denial of his CAT application due to a lack of evidence that he had been tortured in the past or that "the police or other officials would acquiesce in torture committed against" him. (*Id.* at 93.) Palacios-Arias did not petition the Fourth Circuit to review the BIA's dismissal or move to reopen his removal proceedings on ineffective assistance grounds.

Following the BIA's dismissal of his appeal, Palacios-Arias was deported. He later returned to the United States, and on June 17, 2020, was charged with illegal reentry. (ECF No. 16.) Palacios-Arias has served his criminal sentence and is now in immigration custody pending the Court's resolution of his motion to dismiss the indictment.

### III. **DISCUSSION**

To obtain a conviction for illegal reentry under § 1326(a), "the government must prove, as an element of the offense, the defendant's prior removal or deportation." *United States v. Moreno-Tapia*, 848 F.3d 162, 165 (4th Cir. 2017). "Typically, the government may rely on the removal order itself, issued by the Department of Homeland Security ("DHS"), to meet this burden." *Id.* But a defendant may collaterally attack the DHS removal order if he satisfies three statutory prerequisites. *See* 8 U.S.C. § 1326(d). To prevail, the defendant must show that (1) he has "exhausted any administrative remedies that may have been available to seek relief against the order"; (2) the deportation proceeding "improperly deprived" him of "the opportunity for judicial review"; and (3) "the entry of the order was fundamentally unfair." *Id.*; *see also United States v. Guzman-Velasquez*, 919 F.3d 841, 844 (4th Cir. 2019). These statutory requirements address "procedural irregularities in immigration proceedings that may insulate the resulting orders from judicial review, making it fundamentally unfair to rely on those orders in later criminal prosecutions." *Moreno-Tapia*, 848 F.3d at 166 (citing *United States v. Sosa*, 387 F.3d 131,136 (2d Cir. 2004)). Because these "requirements are connected by the conjunctive 'and,' . . . defendants must meet all three." *Palomar-Santiago*, 141 S. Ct. at 1620–21.

Palacios-Arias argues both (1) that he exhausted his administrative remedies by appealing the immigration judge's decision to the BIA, *see* §1326(d)(1), and (2) that his counsel's ineffectiveness satisfies all three of § 1326(d)'s requirements. Because Palacios-Arias must establish his immigration counsel's ineffectiveness to prevail, the Court will first address the question of whether Palacios Arias received ineffective assistance of counsel during his 2017 removal proceedings. The Court finds that Ruiz did not violate Palacios-Arias's Fifth Amendment right to effective assistance of counsel because any alleged errors in his performance did not prejudice

8

Palacios-Arias's chances for relief. Because Palacios-Arias suffered no deprivation of due process, he fails to demonstrate fundamental unfairness under § 1326(d)(3). *See infra* Sec.III.A. Further, because Palacios-Arias did not receive ineffective assistance of counsel, he cannot rely on such a claim to satisfy any of the § 1326(d) requirements. The Court will thus deny his motion again.

### A. Fundamental Unfairness/Ineffective Assistance of Counsel

Palacios-Arias contends that Ruiz's ineffective assistance violated his due process rights, and that this violation satisfies "the statutory requirements of 8 U.S.C. § 1326(d)." (ECF No. 60, at 1, 6–12.) Section 1326(d)(3)'s fundamental unfairness requirement imposes a standard similar to that of a Fifth Amendment ineffective assistance of counsel claim.[14] Because both standards hinge on whether Palacios-Arias likely would have experienced a different outcome but for his counsel's ineffective assistance, the Court analyzes them together.

"[T]o establish fundamental unfairness under § 1326(d)'s third prong, a defendant must show that '(1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" *United States v. Herrera-Pagoada*, 14 F.4th 311, 320 (4th Cir. 2021) (quoting *United States v. El Shami*, 434 F.3d 659, 664 (4th Cir. 2005)); *cf. Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defendant."); *see also Kia v. Barr*, 794 F. App'x 403, 410 (5th Cir. 2019) ("In reviewing [a Fifth Amendment] due process-based claim [in immigration proceedings], this court has applied the standard enunciated in *Strickland*."). Because a petitioner

---

[14] *See infra* notes 15–19 and accompanying text.

must necessarily demonstrate prejudice as an element of ineffective assistance, the two require-ments of § 1326(d)(3) essentially collapse into one.

This case implicates several open questions of law. The Court will thus begin its analysis by briefly discussing a noncitizens' due process rights and explaining the standards by which it analyzes Palacios-Arias's ineffective assistance claim.

### 1. A Noncitizen's Right to Effective Assistance

"[T]he Due Process Clause applies to all 'persons' within the United States, including al-iens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Da-vis*, 533 U.S. 678, 693 (2001). Although this protection includes "alien[s] subject to a final order of deportation, . . . the nature of that protection may vary depending upon status and circumstance." *Id.* at 694.[15] Though the Fourth Circuit has yet to do so, many other circuits have now accepted that the Fifth Amendment's Due Process Clause creates protections in immigration proceedings against ineffective assistance of a noncitizen's retained counsel.[16] (ECF No. 60, at 8 (collecting

---

[15] *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1209 (2018) ("Th[e Supreme] Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.'" (quoting *Lee v. United States*, 137 S. Ct. 1958, 1968 (2017))).

[16] It is well settled, for example, that a noncitizen subject to removal does not have a Sixth Amendment right to counsel in civil deportation proceedings. *See Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("[A]n alien does not have a [S]ixth [A]mendment right to representation in a deportation proceeding." (emphasis added)); *see also Lara-Torres v. Ashcroft*, 383 F.3d 968, 973 (9th Cir. 2004), *amended sub nom. Lara-Torres v. Gonzales*, 404 F.3d 1105 (9th Cir. 2005) ("[S]ince deportation and removal proceedings are civil, they are 'not subject to the full panoply of procedural safeguards accompanying criminal trials,' including the right to counsel under the Sixth Amendment." (quoting *Magallanes-Damian*, 783 F.2d at 933)). A noncit-izen does, however, have the right to *retain* counsel for those proceedings, provided that such representation comes "at no expense to the Government" and that the retained attorney is "author-ized to practice in such proceedings." 8 U.S.C. § 1229a(b)(4)(A); *see also id.* § 1362; 8 CFR §§ 1003.102 (outlining disciplinary sanctions for attorney misconduct), 1292.2 (explaining who can represent a noncitizen in immigration proceedings). Additionally, the statutes governing re-moval afford noncitizens other rights and privileges, including "a reasonable opportunity to

cases from the First, Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh circuits)).[17] But, despite growing consensus that such protection exists, courts do not universally agree on the standard applicable to such claims. *Compare Magallanes-Damian v. I.N.S.*, 783 F.2d 931, 933 (9th Cir. 1986) ("Under th[e] [F]ifth [A]mendment right to counsel, [a] petitioner[] must shoulder a heavier burden of proof" than under the Sixth Amendment. "[He] must show not merely ineffective assistance of counsel, but assistance which is so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the [F]ifth [A]mendment [D]ue [P]rocess [C]lause."), *with Kia*, 794 F. App'x at 410 ("In reviewing [a Fifth Amendment] due process-based claim, this court has applied the standard enunciated in *Strickland.* . . . The BIA based the analysis of [the petitioner's] claims on *Strickland.* . . . [The petitioner] has demonstrated no error in the standard applied by the BIA.").

Assuming the Fifth Amendment entitled Palacios-Arias to effective assistance of counsel during his first removal proceeding, *see supra* note 19, the Court finds that he can establish a

---

examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4); *see also id.* § 1362 (right to counsel in removal proceedings). The noncitizen must also receive timely notice that explains matters such as the nature of the proceedings, the legal authority for the proceedings, and the fact that the noncitizen may secure counsel. *Id.* § 1229(a)(1).

[17] In *Afanwi v. Mukasey*, the Fourth Circuit held that a noncitizen's counsel in immigration proceedings did not violate the noncitizen's constitutional rights because "his alleged ineffectiveness . . . was a purely private act." 526 F.3d 788, 799 (4th Cir. 2008), *cert. granted, judgment vacated sub nom. Afanwi v. Holder*, 558 U.S. 801 (2009) (holding that "[the noncitizen's] counsel's actions do not implicate the Fifth Amendment, and accordingly counsel's alleged ineffectiveness did not deprive [the noncitizen] of due process"). The Supreme Court, however, vacated and remanded the case on appeal.

Here, Palacios-Arias argues that "even if state action were required, the extensive regulation of representatives in federal immigration proceedings results in the functional equivalent of immigration counsel engaging in the action." (ECF No. 60, at 10–11.) For the purposes of Palacios Arias's motion to dismiss the indictment, the Court assumes—as the government does—that a Fifth Amendment due process right to effective assistance of counsel in immigration proceedings exists.

due process violation by showing "the alleged ineffective assistance rendered 'the proceeding . . . so fundamentally unfair that [he was] prevented from reasonably presenting [his] case.'" *Lara-Torres*, 383 F.3d at 973 (quoting *Iturribarria v. INS,* 321 F.3d 889, 899 (9th Cir. 2003)).   To allege prejudice, Palacios-Arias "must show that, but for the errors complained of, there was a reasonable probability that he would not have been deported." *El Shami*, 434 F.3d at 665.  As Palacios-Arias asserts, "[a]t the core of the courts' protections against ineffective assistance of counsel is a desire for fundamental fairness," and "[f]undamental fairness is the precise query in the due process prong of 8 U.S.C. § 1326(d)."  (ECF No. 60, at 12 (citing *Maravilla-Maravilla v. Ashcroft*, 381 F.3d 855, 857–58 (9th Cir. 2004).)

Palacios-Arias originally applied for both asylum and withholding of removal.  "Both asylum and withholding of removal . . . are based on an applicant's showing of 'persecution on account of a statutorily protected status.'" *Alvarez Lagos v. Barr*, 927 F.3d 236, 248 (4th Cir. 2019) (quoting *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018)); *see also* 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.").  But withholding of removal "applies a more stringent standard of proof" (clear probability of persecution) than an asylum claim (well-founded fear of persecution). *Alvarez Lagos*, 927 F.3d at 246; *see Quintero v. Garland*, 998 F.3d 612, 631 (4th Cir. 2021) (stating that "a mere ten-percent chance [of persecution] would suffice" for an asylum claim, whereas a withholding applicant must show "higher than a fifty-percent chance" that they will face prosecution).

Palacios-Arias identifies several alleged errors of counsel, including that Ruiz improperly conceded the untimeliness of Palacios-Arias's asylum claim during his hearing.  Because Palacios-

Arias fails to show a reasonable probability that but for Ruiz's alleged errors the immigration judge would have found him eligible for asylum, the Court finds that he suffered no prejudice. Further, because the Court finds that Palacios-Arias's claims did not render him eligible for asylum, it need not consider whether such evidence would have qualified him for withholding of removal. "[A]n applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal." *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014) (quoting *Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010)).

### 2. Legal Standard for Asylum Claims

To qualify for asylum, a noncitizen must prove that he is "'unable or unwilling' to return to [his] native country because of 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)); *see also* 8 U.S.C. § 1158(b)(1). An asylum applicant who "cannot establish past persecution . . . must prove both the subjective and the objective components of 'a well-founded fear': that the applicant is *subjectively* afraid and that the fear is *objectively* well-founded." *Camara*, 378 F.3d at 367 (emphasis in original).

"Persecution occurs 'on account of' a protected ground if that ground serves as 'at least one central reason for' the feared persecution." *Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). "[M]embership in a nuclear family qualifies as a protected ground for asylum purposes." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015); *see Crespin-Valladares*, 632 F.3d at 124–25 (finding that membership in a family can constitute membership in a particular social group). The question then becomes whether the noncitizen's "membership is 'a central reason why *[]he, and not some other person*' was targeted."

13

*Hernandez-Cartagena v. Barr*, 977 F.3d 316, 322 (4th Cir. 2020) (emphasis in original) (quoting *Alvarez Lagos*, 927 F.3d at 249)).

### 3. The Parties' Arguments

Palacios-Arias identifies four critical errors Ruiz made. First, Ruiz "improperly conceded that [Palacios-Arias] could not demonstrate 'changed circumstances,' based on Mr. Palacios's aunt's murder in August 2017, justifying a late asylum application." (ECF No. 60, at 15 (citing ECF No. 60-2, at 21 (transcript of removal proceedings)).)[18] Second, Ruiz failed to call Palacios-Arias's mother and uncle as witnesses and, thus, "denied the immigration judge the opportunity to hear critical details of the threat that violent criminal gangs posed to Mr. Palacios in El Salvador because of his membership in the Arias family." (ECF No. 60, at 14–15.) Specifically, Palacios-Arias's uncle and mother said they would have testified that:

> (1) several members of the Arias family, including Mr. Palacios's mother, emigrated to the United States, [(ECF No. 60-2, at 179, 185)];
>
> (2) these family members who lived and worked in the United States sent money back to members of the Arias family who had remained in El Salvador, [(*id.* at 185)];
>
> (3) Mr. Palacios's uncle Miguel Arias was kidnapped at gunpoint by gang members when he was sixty-one years old, [(*id.* at 173–75, 180–82)];
>
> (4) the gang members called Mr. Arias by his name, indicating that they knew who he was, [(*id.* at 178)];
>
> (5) the gang members held Mr. Arias for a total of twelve days before releasing him once his family paid a sizeable ransom, [(*id.* at 174, 177–78, 184)];
>
> (6) Mr. Palacios's aunt who took care of him found a note on the door of her home shortly after Mr. Arias was released asking to whom the boy staying with her belonged, [(*id.* at 182)];

---

[18] (*See* ECF No. 60-2, at 65 (immigration judge's finding that she could not grant Palacios-Arias asylum because he failed to apply for it within one year of coming to the United States and no exceptional or new circumstances justified his late application).) The immigration judge thus limited her analysis to withholding of removal and withholding of removal under the CAT. (*Id.*)

(7) shortly thereafter, Mr. Palacios's aunt found gang symbols and letters painted on the outside wall of her home, [(*id.* at 183)];

(8) Mr. Palacios's aunt kept him inside her home at all times after the uncle's recent kidnapping in the same town and the note and graffiti indicating that the gang members were looking to target Mr. Palacios next because the Arias family feared greatly for Mr. Palacios's safety, [(*id.* at 182–84)]; and

(9) that gang members entered Mr. Palacios's aunt Juana Arias's home at night in August 2017, killed Ms. Arias, and attacked her father, causing him to be hospitalized, [(*id.* at 184–85; ECF No. 60-1, at 119)].

(ECF No. 60, at 14.)

Third, Ruiz failed to translate the court document describing the prosecution of Palacios-Arias's uncle's kidnappers. (*Id.* at 14–15.) Fourth, he failed to identify Palacios-Arias's family as the persecuted social group. (*Id.* at 15 (citing ECF No. 60-2, at 56–57 (transcript of removal proceedings) (defining the social group instead as "a Salvadorian adult males, who were raised and lived in the U.S. since middle childhood").) Absent these errors, Palacios-Arias contends that "there is a reasonable probability that [he] would have obtained relief from removal." (ECF No. 60, at 16.)

The government argues that Ruiz did "articulate [Palacios-Arias's] membership in the Arias family social group" and, even if he did not, "any error should be deemed harmless in light of the BIA's explicit rejection of the defendant's family-based persecution claim." (ECF No. 61, at 20.) Palacios-Arias further "doomed" his own claim by revealing his lack of knowledge of the conditions in El Salvador. (*Id.* at 21.) And the evidence in the record presented the immigration judge with the same facts that Palacios-Arias's mother's and uncle's testimony would have provided. (*Id.* at 21–22.) Thus, even if Ruiz performed deficiently, Palacios-Arias suffered no prejudice because his mother and uncle would not have demonstrated the necessary nexus between their family name and either the harm their family members suffered in El Salvador or the persecution they feared Palacios-Arias would face upon his return. (*Id.* at 28.)

*4. Analysis*

The Court begins with Palacios-Arias's argument that Ruiz should not have conceded that Palacios-Arias could not demonstrate "changed circumstances" to justify his untimely asylum application. *See Zambrano v. Sessions*, 878 F.3d 84, 88 (4th Cir. 2017) ("New facts that provide additional support for a pre-existing asylum claim can constitute a changed circumstance."). Changed circumstances might include "an intensification of a preexisting threat of persecution or new instances of persecution of the same kind suffered in the past." *Id.* Thus, his aunt's August 2017 murder *could have* constituted a changed circumstance.

But even if Palacios-Arias's aunt's murder constituted a changed circumstance that would have justified an untimely asylum application, Palacios-Arias has not shown that there was a reasonable probability that he would have succeeded on an asylum claim. As discussed below, Palacios-Arias presented little evidence that he feared any gang or individual would target him because of his Arias family membership or membership in any other particularized social group. To the contrary, Palacios-Arias professed only generalized fears of gang violence based on two unrelated incidents involving his family members nearly two decades apart. Indeed, neither he *nor his family* could specifically identify the perpetrating gang or any connection between the speculative harm to Palacios-Arias and his membership in the Arias family (other than the fact that the victims and Palacios-Arias shared a last name).[19] Such fear of generalized violence cannot alone support a

---

[19] *See Salgado-Sosa*, 882 F.3d at 458 (finding that the noncitizen's "relationship to his stepfather (and to his family) is indisputably 'why [he], and not another person, was threatened' by MS–13" (quoting *Hernandez-Avalos*, 784 F.3d 950); *Hernandez-Avalos*, 784 F.3d at 950 (finding that the noncitizen's "relationship to her son is why she, and not another person, was threatened with death if she did not allow him to join Mara 18, and the gang members' demands leveraged her maternal authority to control her son's activities"); *Perez Vasquez*, 4 F.4th at 225 ("[T]he gang targeted [the noncitizen], and not some other person, because of her familial relationship to her husband, who sent her money from the United States every month."); *Hernandez-Cartagena*, 977 F.3d at 322 ("[The noncitizen] clearly demonstrated that *her family* was being

16

successful asylum application. *Cf. Huaman-Cornelio v. BIA*, 979 F.2d 995, 1000 (4th Cir. 1992) ("Even aliens with a 'well-founded fear' of persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears . . . general conditions of upheaval and unrest.").

Palacios-Arias also says that Ruiz erred by not calling Palacios-Arias's mother and uncle to testify. To recap, they would have testified that "several members of the Arias family, including Mr. Palacios's mother, emigrated to the United States" and that these family members "sent money back to members of the Arias family who had remained in El Salvador." (ECF No. 60, at 14.) Despite the financial extortion Palacios-Arias's relatives faced in 2001, his mother's and uncle's testimony does not establish that the gang targeted, or would target, Palacios-Arias or his aunt based on their membership in the Arias family. To the contrary, their testimony may have undermined Ruiz's attempt to present a family-based argument.[20]

Second, the immigration judge already considered much of the testimony Palacios-Arias's mother and uncle would have provided regarding his uncle's kidnapping, the threats Palacios-Arias faced as a child in El Salvador, and the fact that individuals murdered Palacios-Arias's aunt in 2017. (*See* ECF No. 60-1, at 73, 75, 119; ECF No. 60-2, at 25–27, 28.) Though their testimony could have provided some additional details regarding Palacios-Arias's uncle's kidnapping and

---

targeted for extortive threats and *she* was targeted because her parents were failing to comply with those threats." (emphasis in original)); *Arita-Deras*, 990 F.3d at 361 ("If [the noncitizen] were not married to Pineda-Vidal, she would not have been targeted with these threats."). *But see Cortez-Mendez v. Whitaker*, 912 F.3d 205, 211 (4th Cir. 2019) (denying noncitizen's appeal where "[a]ll [the noncitizen] provided was his unsubstantiated speculation that the gangs targeted him because of his father's disabilities.").

[20] (*See, e.g.,* ECF No. 60-2, at 185 (Palacios-Arias's mother's statement that she did not know why gang members murdered Palacios-Arias's aunt and beat up his aunt's father in 2017).)

17

the specific threats Palacios-Arias faced as a child,[21] the immigration judge carefully considered and found insufficient these incidents and circumstances from the early 2000s.

Finally, their additional testimony would not have remedied the core deficiencies the immigration judge found in Palacios-Arias's testimony and application. The immigration judge pointed out, for example, that Palacios-Arias could not identify "the entities that he[ was] fearful of." (ECF No. 60-2, at 71.) The Court finds that neither his uncle's nor mother's testimony would have further clarified this necessary aspect of Palacios-Arias's claim. (*See id.* at 175 (uncle's testimony that he did not know who kidnapped him, but he "suppose[d] that it was the gang"); *id.* at 185 (mother's testimony that she did not why the gang members murdered Palacios-Arias's aunt or beat up his aunt's father).)[22]

The immigration judge further found that, based on Palacios-Arias's speculations, she could not "find . . . that some individuals that are responsible for harming Arias family members would now be interested in harming him" and noted that such a contention was not "substantiated by anything in the record whatsoever." (*Id.* at 71.) The immigration judge drew this conclusion

---

[21] For example, Palacios-Arias's uncle could have clarified that he was kidnapped at gunpoint, (ECF No. 60-2, at 173); that his captors held him for twelve days and released him only after he paid a ransom, (*id.* at 174); and that they called him by his last name, (*id.* at 178). And his mother could have explained that Palacios-Arias's aunt found a note on her door asking who the boy (Palacios-Arias) belonged to, (*id.* at 182), and that his aunt saw gang symbols and letters on the outside wall of her home shortly after the kidnapping, (*id.* at 183).

[22] Palacios-Arias says that his mother's testimony would have established that "gang members" murdered his aunt. (*See id.* at 185.) But this testimony does not create any connection between the alleged gang members who kidnapped Palacios-Arias's uncle, those who allegedly drew signs on Palacios-Arias's other aunt's wall, and those who tried to beat up his aunt's father and, when she intervened, murdered her instead. In other words, the fact that gang members assaulted Palacios-Arias's family members in 2017 does not establish that he would face threats from these unidentified gangs at least in part because of his membership in the Arias family.

even knowing that Palacios-Arias "was harassed by the same member of the organized crime group" as his uncle.  (ECF No. 60-1, at 73.)

For the third alleged deficiency, Palacios-Arias says that Ruiz failed to translate the court document describing the prosecution of Palacios-Arias's uncle's kidnappers.  But, as described above, the immigration judge already considered the kidnapping and that "[t]he criminals were eventually arrested and charged with aggravated kidnapping."  (*Id.* at 73.)  Further, this Court notes that, absent some showing that the government's response was somehow inadequate, these facts weigh against Palacios-Arias's claims for asylum.  *See Arita-Deras v. Wilkinson*, 990 F.3d 350, 357 (4th Cir. 2021) (noting that "[a]n alien seeking asylum . . . must produce evidence establishing . . . that the persecution is perpetrated by an organization that [his] home country's government is unable or unwilling to control").  Thus, this Court finds no reasonable likelihood that the entry of the document would have changed the outcome of Palacios-Arias's removal proceeding.  (*See* ECF No. 60-1, at 50–51.)

Finally, Palacios-Arias faults Ruiz for failing to identify the Arias family as the persecuted social group.  On appeal, the BIA rejected Palacios-Arias's argument that the immigration judge "fail[ed] to consider his family membership" because Palacios-Arias did not, in fact, articulate that group before the immigration judge.  (ECF No. 60-2, at 93.)  Thus, the Court finds that Ruiz's decision could have caused Palacios-Arias to suffer actual prejudice if the immigration judge had denied his application and the BIA dismissed his appeal on those grounds alone.

But both the immigration judge's initial decision, (*id.* at 71), and the BIA's dismissal of Palacios-Arias's appeal explained that Palacios-Arias "presented insufficient evidence that he is likely to be harmed in El Salvador on account of his family membership or any protected ground," (*id.* at 93).  Thus, the Court concludes that it was not a poorly defined social group which doomed

19

his claims. Rather, even if Ruiz had clearly identified Palacios-Arias's membership in the Arias family as a protected group, his application would have failed for lack of the critical nexus: Palacios-Arias failed to show that *he* would be harmed *based on his membership* in that group. Full consideration of the additional evidence and testimony that Palacios-Arias says Ruiz should have presented does not create a reasonable probability of a different result.

Because Palacios-Arias has not shown a reasonable probability that he would not have been deported but for his attorneys' alleged errors, the Court concludes that Ruiz did not provide ineffective assistance of counsel under the Fifth Amendment, and thus the removal hearing was not fundamentally unfair.

### B. Opportunity for Judicial Review

#### 1. Legal Standard

Under § 1326(d)(2), Palacios-Arias must show that his removal proceeding "improperly deprived [him] of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). This would apply, for example, "where a procedural defect in an immigration proceeding insulates the resulting order from judicial review," *Moreno-Tapia*, 848 F.3d at 169, or where a noncitizen executes an invalid waiver of the right to seek judicial review of the removal order, *United States v. Lopez-Collazo*, 824 F.3d 453, 458–59 (4th Cir. 2016).

#### 2. The Parties' Arguments

Palacios-Arias argues that Ruiz "deprived [Palacios-Arias] of the opportunity of judicial review by failing to create a record that would enable judicial review and failing to present a material argument over which jurisdiction had been stripped from the courts." (ECF No. 60, at 19.) First, because the circuit courts must "decide the petition only on the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), the Fourth Circuit "would have

had no jurisdiction to consider (1) the Spanish translation of the report of Mr. Palacios's uncle's kidnapping; (2) the anticipated testimony of Mr. Palacios's mother and uncle, both of which were material to his claims, and both of which his attorney failed to enter into the administrative record; and (3) the attorney's failure to articulate the persecuted social group, Mr. Palacios's family." (ECF No. 60, at 17.)  Second, regarding Ruiz's concession that Palacios-Arias could not justify his late asylum application, courts do not have jurisdiction to review a changed-circumstances determination made by the Attorney General. *See* 8 U.S.C. § 1158(a)(3).[23]

The government argues that Palacios-Arias availed himself of the BIA appeals process and that "nothing prevented [him from] . . . appeal[ing] the BIA's dismissal of his application to the Fourth Circuit." (ECF No. 61, at 17–18.)  It also argues that "[Palacios-Arias was] not precluded from judicial review because the chances of success on appeal [were] uncertain." (*Id.* at 18.)

### 3. Analysis

Because Palacios-Arias has not shown that he received ineffective assistance of counsel during his initial removal proceeding, he cannot rely on those grounds to argue that he satisfies § 1326(d)(2).  The Court also finds that to the extent the Fourth Circuit would not have been able to review Ruiz's failure to articulate the Arias family as the persecuted social group on appeal, Palacios-Arias caused that deprivation by failing to raise an ineffective assistance of counsel claim at the agency level.

---

[23] *But see* 8 U.S.C. § 1252(a)(2)(D) (permitting judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals"); *Lizama v. Holder*, 629 F.3d 440, 445–46 (4th Cir. 2011).

### C. Administrative Exhaustion[24]

Because the Court finds that Palacios-Arias did not receive ineffective assistance of counsel during his original removal proceedings, Palacios-Arias's motion fails under the second and third prongs of § 1326(d).  Accordingly, the Court declines to decide whether the issue exhaustion requirement the Fourth Circuit imposes for appellate review under § 1252 also applies to Palacios-Arias's collateral attack under § 1326 and thus whether Palacios failed to exhaust his administrative remedies by failing to file a motion to reopen on those grounds.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Palacios-Arias fails to demonstrate that his immigration counsel's deficient performance prejudiced the outcome of Palacios-Arias's 2017 removal proceedings.  Absent such a showing, Palacios-Arias does not meet his burden under 8 U.S.C. § 1326(d).  Accordingly, the Court will deny his motion.  (ECF No. 24.)

An appropriate Order shall issue.

Let the Clerk mail a copy of this Opinion to all counsel of record.

Date: 15 November 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

---

[24] To collaterally attack his removal order, Palacios-Arias must also have "exhausted any administrative remedies that may have been available to seek relief against the order." 8 U.S.C. § 1326(d)(1).  "With the exception of 'certain constitutional challenges that are not within the competence of administrative agencies to decide,' failure to present a claim in administrative proceedings bars federal courts from passing on that claim." *United States v. De La Mora-Cobian*, 18 F.4th 1141, 1146 (9th Cir. 2021).  The administrative exhaustion requirement serves "the congressional intent underlying § 1326(d) to defer to agency determinations and restrict collateral attacks on those agency determinations." *United States v. Castillo-Martinez*, 16 F.4th 906, 914 (1st Cir. 2021).